[This decision has been published in *Ohio Official Reports* at 97 Ohio St.3d 309.]

THE STATE OF OHIO, APPELLEE, *v.* THOMAS, APPELLANT.

[Cite as *State v. Thomas*, 2002-Ohio-6624.]

*Criminal law—Aggravated murder—Death penalty upheld, when—Claim of mental retardation—Defendant may file for post-conviction relief under the standards set forth in State v. Lott.*

(No. 1999-1511—Submitted April 9, 2002—Decided December 11, 2002.)

APPEAL from the Court of Appeals for Lucas County, No. L-96-020.

_____

LUNDBERG STRATTON, J.

{¶1} In this appeal, defendant-appellant, William A. Thomas, raises fifteen propositions of law. Finding none meritorious, we affirm his convictions. We have independently weighed the aggravating circumstances against the mitigating factors and compared his sentence with those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm defendant's convictions and sentence of death.

{¶2} Defendant broke into Florence "Molly" Newbirt's home in Toledo, Ohio, during the early morning of November 23, 1994. The defendant robbed and murdered 87-year-old Newbirt by repeatedly striking her with a hammer on the head. Defendant stole a television set from Newbirt's bedroom, fled, and attempted to sell the television to an acquaintance later that morning. The defendant was convicted of aggravated murder, aggravated burglary, and aggravated robbery, and sentenced to death.

{¶3} To establish defendant's guilt, the state introduced defendant's hat, found at the crime scene; defendant's shoe, containing a shard of glass from Newbirt's basement window; forensic testimony that a bloody shoeprint on Newbirt's bedroom pillowcase was of defendant's shoe; testimony that the murder

weapon (i.e., the hammer) came from defendant's home; and testimony that defendant attempted to sell Newbirt's television to James Lightner on the morning of November 23.

**State's Case**

{¶4} On the evening of November 22, 1994, defendant attended a birthday party for his niece at his home at 239 Hanover Street in Toledo. Defendant lived at this address with his sister and Wesley Thomas, his nephew.

{¶5} During the party, defendant asked four or five people for money, but no one loaned him any. Defendant owed Wesley $10 and told Wesley he could not pay him. They argued but then resumed drinking. Defendant had a black baseball cap, which portrayed an Uzi machine gun and a number 187 logo, in his hand at the party. Wesley had previously owned the hat, and the defendant sometimes wore it. The number 187 represented the California Penal Code number for homicide.

{¶6} As the evening progressed, defendant was in a "pretty bad mood," "mad" and "drunk," according to Wesley. Defendant left the party around midnight and did not return.

{¶7} Newbirt lived a few houses away at 223 Hanover Street. Sandra Connolly lived behind Newbirt's residence. Between 3:00 a.m. and 4:00 a.m. on November 23, Connolly and her daughter, Deborah Connolly, were leaving for work when they noticed that Newbirt's back door was open and her back door lights were not on. They suspected that something was wrong, and after arriving at work, Deborah notified the police by calling 911.

{¶8} Toledo police officers responding to the 911 call entered Newbirt's home and found her battered body lying under a mattress in the bedroom. Newbirt was still alive and was rushed to the hospital. Police secured the crime scene and began collecting evidence from Newbirt's home.

{¶9} The police found a smashed basement window and glass on the basement floor, indicating that the culprit had entered Newbirt's home through the

basement. Defendant's ball cap (with the Uzi machine gun and the number 187 logo) was found on the steps by the broken window. Footprints on the lower portion of the basement door and a broken doorjamb suggested that the assailant had entered the main part of the house through the forced basement door.

{¶10} Police found a clump of the victim's white hair lying near a phone receiver that had been ripped from the wall, which indicated a struggle in the kitchen and dining-room area. However, blood spatters on the bedroom walls and closet doors suggested that Newbirt was murdered in her bedroom.

{¶11} The murder weapon was a claw hammer found on the bedroom floor near the victim's body. The police also collected a pillowcase from under the bedroom desk that appeared to have a partial footprint on it. An expert concluded that defendant's Nike tennis shoe made the bloody footprint on Newbirt's pillowcase. Experts also established that DNA from blood on the hammer matched DNA from blood removed from the pillowcase.

{¶12} The police concluded that Newbirt had been robbed, since the contents of her purse had been dumped. Police also determined that a television set had been stolen from her bedroom on the basis of an empty table top where dust silhouetted a clean rectangular shape, a nearby A/B switch and a TV cable, and a TV owner's manual in the bedroom.

{¶13} The assailant appeared to have fled from Newbirt's residence through the back door. The back door was open, and police collected a women's purple coat lying on the ground between the rear door and the back fence.

{¶14} At approximately 2:30 a.m. that night, before the crime was discovered, defendant went to Lightner's residence and knocked loudly on his door. Lightner lived at 1654 Campbell Street, which was several blocks from the victim's residence. After Lightner let the defendant in, Lightner noticed that the lower parts of defendant's pants were covered with blood. Defendant said "he had gotten into a fight with a guy." However, Lightner did not notice any marks on defendant's

hands or face indicating that he had actually been in a fight. Defendant then offered to sell Lightner a television set. Defendant said that "him and some guy stole it and they got to fighting over it." Lightner refused to buy the television, and the defendant left. Shortly thereafter, defendant returned to Lightner's home, asked for a ride to another location, and Lightner agreed.

{¶15} Defendant took the television set with him in Lightner's car. Upon arriving at Junction and Buckingham, defendant and an unidentified man took the television set out of Lightner's car, put it into the trunk of another car, and drove off. At trial, Lightner agreed that that television looked like the one pictured on the owner's manual found in Newbirt's bedroom.

{¶16} At the hospital, Newbirt's family told police about a neighborhood man who performed odd jobs for the victim and attempted to borrow money from her. Further investigation led police to defendant's home, where they talked to Wesley. He told police that defendant had attended a party there the night before and had left the house around midnight. Wesley identified distinctive markings on the hammer, noting that it came from a drawer in their house. Wesley described the clothes defendant had been wearing, including the baseball cap with the Uzi machine gun and the number 187 logo. He also identified the hat when police showed it to him.

{¶17} Officer Thomas Ross interviewed defendant following his arrest two days later on November 25, 1994. According to the defendant, he stayed at the Cherry Street Mission, a local homeless shelter, the day of the crime. Defendant told police that he had turned in his "old and soiled" clothes, and "the people at the mission gave him new clothes." Ross seized defendant's Nike tennis shoes after noticing blood on one of them. A piece of glass was also found embedded inside the shoe. At trial, an expert concluded that there was a "very strong probability" that the glass fragment came from Newbirt's basement window based on its refractive index.

{¶18} When asked how blood got on his shoes, defendant said, "[M]y mind went blank, I don't remember." Defendant told Ross that he knew the victim because "she lived a few doors down from him, and that he on occasion had raked some leaves for her." When asked if he broke into her home and attacked her, defendant said, "[I]f I did something like that, I don't remember. I'm just sick from some bad drugs I got that night."

{¶19} Defendant remembered drinking beer at the party on November 22, but "everything went blank after that." Defendant next remembered "waking up in a vacant house near Junction and Nebraska and walking down to the Cherry Street Mission and being admitted there." Defendant said that he did not recall carrying a television set that night or trying to sell a television set to Lightner. When asked again about attacking Newbirt, defendant said, "This isn't me William. Doesn't seem I'd do anything like that."

{¶20} Newbirt remained hospitalized from the attack for a month, until she died on December 23, 1994. Newbirt had suffered approximately 15 to 20 injuries to her head and face. Several circular depressed skull fractures showed that a hammer or a similar object caused Newbirt's injuries. The deputy coroner concluded that Newbirt died as a "result of respiratory complications * * * due to craniocerebral injuries that she sustained in a beating."

{¶21} At trial, the defense elected not to present any evidence.

### Trial Result

{¶22} The three-judge panel convicted defendant as charged. Count I, charging defendant with aggravated murder, included a capital specification for murder during an aggravated burglary and a second capital specification for murder during an aggravated robbery. Counts II and III separately charged defendant with aggravated burglary and aggravated robbery.

**{¶23}** The three-judge panel sentenced defendant to death on Count I. Defendant was also sentenced to 10 to 25 years in prison on Count II and 10 to 25 years in prison on Count III.

**{¶24}** The court of appeals affirmed the convictions and death sentence.

### Pretrial Issues

**{¶25}** *Jury waiver.* In proposition of law III, defendant claims that his waiver of a jury trial was insufficient because the record does not affirmatively establish that he was fully aware of all the effects of his waiver. Defendant cites *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, which reaffirmed " 'the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.' " Id., quoting *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 239 N.E.2d 65. Defendant argues that the trial court was required by the Constitution to ensure that he understood that this presumption would be applied on appellate review if he waived a jury trial.

**{¶26}** In *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, paragraph one of the syllabus, we held, "There is no requirement for a trial court to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial." "The Criminal Rules and the Revised Code are satisfied by a written waiver, signed by the defendant, filed with the court, and made in open court, after arraignment and opportunity to consult with counsel. While it may be better practice for the trial judge to enumerate all the possible implications of a waiver of a jury, there is no error in failing to do so." (Citation omitted.) Id. at 26, 559 N.E.2d 464; see, also, *State v. Filiaggi* (1999), 86 Ohio St.3d 230, 238, 714 N.E.2d 867; *State v. Baston* (1999), 85 Ohio St.3d 418, 421, 709 N.E.2d 128.

**{¶27}** Defendant signed two jury waivers in open court, and both waivers conformed to the dictates of R.C. 2945.05. *Jells* holds that the statute and rules require no inquiry, and we now hold that nor does the Constitution. Therefore, the

trial court's failure to advise defendant about the legal consequences of his jury waiver was not error. Thus, we reject proposition III.

{¶28} *Validity of the jury waiver*. In proposition of law IV, defendant argues that the three-judge panel lacked jurisdiction to try his case. First, defendant contends that the panel lacked jurisdiction because one of the jury waivers was not journalized.

{¶29} R.C. 2945.05 requires that a waiver of a jury trial must be written, signed by the defendant, and filed and made a part of the record. In the absence of strict compliance with R.C. 2945.05, a trial court lacks jurisdiction to try the defendant without a jury. *State v. Pless* (1996), 74 Ohio St.3d 333, 658 N.E.2d 766, paragraph one of the syllabus. The requirement that a jury waiver form be " 'filed in said cause and made a part of the record thereof' means that the form must be time-stamped and included in the record." *State v. Gipson* (1998), 80 Ohio St.3d 626, 632, 687 N.E.2d 750; but, see, *State v. Otte* (2002), 94 Ohio St.3d 167, 169, 761 N.E.2d 34 (jurisdiction to hold a bench trial where jury waiver was physically located in the case file but had not been file-stamped).

{¶30} The jury waivers contained identical language. The waiver dated October 12, 1995, was date-stamped and properly journalized. Defendant's second jury waiver, dated October 30, 1995, was date-stamped but not journalized. The October 12 jury waiver met the strict statutory requirements of R.C. 2945.05. Thus, the second jury waiver was superfluous.

{¶31} In his second contention, defendant argues that the order establishing the three-judge panel was not properly executed. Defendant claims that the order was invalid because the signing judge was not a general division judge of the Lucas County Court of Common Pleas.

{¶32} R.C. 2945.06 provides, "If the accused is charged with an offense punishable with death, he shall be tried by a court to be composed of three judges, consisting of the judge presiding at the time in the trial of criminal cases and two

other judges to be designated by the presiding judge or chief justice of that court, and in case there is neither a presiding judge nor a chief justice, by the chief justice of the supreme court."

{¶33} Here, the judgment entry establishing the three-judge panel was signed by a judge on the domestic relations bench of the Lucas County Court of Common Pleas. However, there is no authority in R.C. 2945.06 or elsewhere to support defendant's contention that the order designating a three-judge panel must be signed by a general division common pleas judge.

{¶34} Moreover, defendant did not object at trial to the presiding judge's authority. Thus, this issue was waived and there was no plain error. Cf. *State v. Bays* (1999), 87 Ohio St.3d 15, 26, 716 N.E.2d 1126 (waiver by failing to object at trial to probate judge's assignment to the three-judge panel). Accordingly, we reject proposition IV.

**Trial Issues**

{¶35} *Competency*. In proposition of law I, defendant argues that the trial court erred by failing to *sua sponte* find that he was incompetent to stand trial. According to the defendant, the "record reveals * * * upon the representations to the court by his attorneys" that he was unable to assist them in his own defense. Defendant claims that the record is replete with instances where he was acting against his own interests. Moreover, defendant argues that his behavior raised substantial questions about his ability to understand the consequences of his trial or assist in his own defense.

{¶36} "It has long been recognized that 'a person [who] lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.' " *State v. Smith* (2000), 89 Ohio St.3d 323, 329, 731 N.E.2d 645, quoting *Drope v. Missouri* (1975), 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103. Fundamental principles of due process require that a criminal defendant who is legally

incompetent may not be tried. *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433.

{¶37} R.C. 2945.37(B) requires a competency hearing if a request is made before trial. *State v. Were* (2002), 94 Ohio St.3d 173, 761 N.E.2d 591, paragraph one of the syllabus. But R.C. 2945.37(B) provides that "[i]f the issue is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion."[1] Thus, the decision whether to hold a competency hearing once trial has begun is in the court's discretion. *State v. Rahman* (1986), 23 Ohio St.3d 146, 156, 23 OBR 315, 492 N.E.2d 401. The right to a hearing rises to the level of a constitutional guarantee when the record contains sufficient "indicia of incompetency" to necessitate inquiry to ensure the defendant's right to a fair trial. *State v. Were*, 94 Ohio St.3d 173, 761 N.E.2d 591, paragraph two of the syllabus; *State v. Berry*, 72 Ohio St.3d at 359, 650 N.E.2d 433. Objective indications such as medical reports, specific references by defense counsel to irrational behavior, or the defendant's demeanor during trial are all relevant in determining whether good cause was shown after the trial had begun. *State v. Chapin* (1981), 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317, paragraph one of the syllabus.

{¶38} Here, the record fails to indicate that defendant had difficulty understanding the proceedings or that he was incapable of assisting his counsel in his defense. During the trial, the trial court questioned defendant about appointment of a lawyer, jury waiver, counsel's temporary absence from the courtroom, counsel's possible conflict of interest, and defendant's right to make a sworn or unsworn statement during mitigation. Defendant showed that he understood the proceedings by meaningfully responding to each of the trial court's

---

1. The last phrase was added in 1996, after the trial. 146 Ohio Laws, Part VI, 11186.

questions. Moreover, the defense counsel affirmatively indicated throughout the trial that defendant understood the proceedings.

{¶39} In addition, the defense counsel never suggested that defendant was incompetent. Counsel had ample time to become familiar with defendant's competency, since they represented him from their appointments in December 1994 or January 1995 through completion of the December 1995 sentencing proceedings. If counsel had some reason to question defendant's competency, they surely would have done so. Cf. *State v. Hessler* (2000), 90 Ohio St.3d 108, 125, 734 N.E.2d 1237. Finally, no expert or lay opinion indicated that defendant was actually incompetent. During the mitigation hearing, Dr. Jeffrey Smalldon and Dr. Janice Ort, clinical psychologists, testified that defendant's significant intellectual deficiencies placed him in the low borderline range of mental functioning. However, neither witness expressed any reservations about defendant's competency to stand trial. The trial court did not err by failing to find *sua sponte* that defendant was incompetent to stand trial, and we find that proposition I lacks merit.

{¶40} In proposition of law II, defendant argues that his counsel were ineffective by failing to ask the trial court to hold a hearing or order a psychiatric examination to determine his competency to stand trial. Reversal of convictions on ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶41} Here, defendant did not display sufficient indicia of incompetency to warrant a competency hearing. See *State v. Smith*, 89 Ohio St.3d at 334, 731 N.E.2d 645. Thus, his counsel's failure to request the trial court to order a competency hearing did not constitute deficient performance, and we reject proposition II.

{¶42} *Advice on testifying*. In proposition of law V, defendant argues that the trial court violated his constitutional rights by failing to inquire *sua sponte* whether defendant knew he had an "absolute right to testify in his own behalf," and whether defendant "knowingly, intelligently, and personally waives that right." However, " 'a trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense.' (Emphasis sic.)" *State v. Green* (2000), 90 Ohio St.3d 352, 375, 738 N.E.2d 1208, quoting *State v. Bey* (1999), 85 Ohio St.3d 487, 499, 709 N.E.2d 484.

{¶43} Nothing in the record suggests that defendant wanted to testify and was denied the opportunity to do so. Nothing suggests that defendant was unaware of his right to testify or that defendant's counsel failed to advise him of his right. Indeed, his counsel informed the trial court that "[a]fter having discussed with Mr. Thomas his right to testify in this matter, the fact that he would be subjected to cross examination, the fact that if he declines to testify that the Court will draw no inference from that failure to testify and the fact the prosecution will not comment upon it in their closing argument, it would be the defendant's desire at this time to not testify * * *." Thus, we find that proposition V lacks merit.

{¶44} *Expert qualifications*. In proposition of law VI, defendant argues that the trial court erred by allowing Detective Chad Culpert to testify about blood-spatter evidence without determining that he was qualified to testify as an expert. Defendant claims that Culpert's testimony provided "physical and scientific support" to Wesley Thomas's testimony (i.e., that the hammer found in the victim's bedroom came from defendant's home) and led to findings that the hammer was the murder weapon.

{¶45} However, defendant never objected to Culpert's opinions or challenged his qualifications to testify. Thus, defendant waived all but plain error. Crim.R. 52(B); *State v. Hartman* (2001), 93 Ohio St.3d 274, 285-286, 754 N.E.2d 1150.

{¶46} Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Neither special education nor certification is necessary to confer expert status upon a witness. "The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Hartman*, 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v. Baston*, 85 Ohio St.3d 418, 423, 709 N.E.2d 128. Pursuant to Evid.R. 104(A), the trial court determines whether a witness qualifies as an expert, and that determination will be overturned only for an abuse of discretion. *State v. Hartman*, 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 446 N.E.2d 444.

{¶47} Culpert testified about blood spatters found on the walls and closet door of the victim's bedroom. He stated that the concentration of blood spatters indicated that two blows were delivered at or near the bedroom wall.

{¶48} Culpert, a Toledo police detective assigned to the scientific investigation unit, was never questioned during direct examination about his professional qualifications and experience. However, Culpert's responsibilities were to "handle, collect, and process the [crime] scene for any physical evidence * * * that may be pertinent to the investigation." Thus, we find no plain error and reject proposition VI.

{¶49} In proposition of law VII, defendant argues his counsel's ineffectiveness by failing to object to Culpert's blood-spatter testimony because he was not qualified as an expert witness. As previously discussed, reversal of a conviction for ineffective assistance of counsel requires that defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶50}** Defendant does not directly attack Culpert's qualifications to present expert testimony on blood-spatter evidence. In any event, Culpert's expert qualifications cannot be evaluated since his professional background and qualifications were not presented or questioned at trial. Moreover, defendant cannot add to the record, since "[a] reviewing court cannot add matter to the record before it * * * and then decide the appeal on the basis of the new matter." *State v. Ishmail* (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 500, paragraph one of the syllabus.

**{¶51}** By not challenging Culpert's qualifications, defense counsel avoided inviting the prosecutor to ask questions that might bolster Culpert's qualifications in the eyes of the court. Given the strong presumption that counsel's performance constituted reasonable assistance, we find that counsel's failure to object may have been a tactical decision and reject this claim of ineffectiveness. See *State v. Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373; cf. *State v. Hartman*, 93 Ohio St.3d 274, 297, 754 N.E.2d 1150. Therefore, we find that proposition VII lacks merit.

**{¶52}** *Reasonable doubt*. In proposition of law XII, defendant challenges the trial court's use of the definition of "reasonable doubt" in R.C. 2901.05(D) during both phases of the trial. However, we have repeatedly affirmed the constitutionality of R.C. 2901.05. E.g., *State v. Jones* (2001), 91 Ohio St.3d 335, 347, 744 N.E.2d 1163; *State v. Hessler*, 90 Ohio St.3d at 127, 734 N.E.2d 1237. Thus, we reject proposition XII.

**Visiting Judge's Ruling**

**{¶53}** During the penalty phase, defendant's counsel objected that the two victim-impact statements "go well beyond what [R.C.] 2930.14 has provided for in terms of an [sic] victim impact statement." The three-judge panel requested a visiting judge, not assigned to the case, to rule on the admissibility of the victim-impact statements "because obviously it would taint any members of the Panel or the entire Panel if we heard the statements and then made a ruling on what we can't hear." In this regard, the panel stated that "after discussions with the Panel by all of counsel, it has been agreed upon that the statements may be read as redacted by the Honorable Sumner Walters, a visiting judge, and his rulings will be made as regards the redacted statements."

**{¶54}** Judge Walters considered defense objections to the content of the victim-impact statements outside the presence of the three-judge panel. Judge Walters ruled that the two particular statements should be eliminated from the victim-impact statements. He admitted the remainder of the statements.

**{¶55}** The defense renewed objections to the redacted statements before the three-judge panel, and those objections were overruled. Thereafter, the two statements were presented for the panel's consideration.

**{¶56}** The three-judge panel was designated in accordance with the requirements of R.C. 2945.06. R.C. 2945.06 sets forth no procedures authorizing the panel to request a visiting judge to rule on the admissibility of victim-impact evidence. *Berger v. Berger* (1981), 3 Ohio App.3d 125, 128-129, 3 OBR 141, 443 N.E.2d 1375; *Rosenberg v. Gattarello* (1976), 49 Ohio App.2d 87, 93-94, 3 O.O.3d 151, 359 N.E.2d 467; see, also, *State ex rel. Chavis v. Griffin* (2001), 91 Ohio St.3d 50, 51, 741 N.E.2d 130. The Ohio Rules of Superintendence provide that the judge assigned to a case under the individual assignment system "becomes primarily responsible for the determination of every issue and proceeding in the case until its termination." Sup.R. 36(B)(1).

**{¶57}** Here, the three-judge panel did not need to shield itself from improper consideration of victim-impact testimony. R.C. 2945.06 provides that the judges or a majority of them on a three-judge panel "may decide all questions of fact and law arising upon the trial." In contrast to juries, judges are presumed to know the law and expected to consider only relevant, material, and competent evidence during their deliberations. See *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754; cf. *State v. Gillard* (1988), 40 Ohio St.3d 226, 229, 533 N.E.2d 272.

**{¶58}** However, the improper referral of an evidentiary matter to another judge did not go to the jurisdiction of the court or render the judgment void. See *Berger v. Berger*, 3 Ohio App.3d 125, 130-131, 3 OBR 141, 443 N.E.2d 1375; cf. *State v. Filiaggi*, 86 Ohio St.3d 230, 240, 714 N.E.2d 867. The decision to employ a different judge to rule on a victim-impact statement was a cautious decision to avoid any possible taint. Moreover, the defense agreed to Judge Walter's appointment to rule on the content of the victim-impact statements. Thus, this issue was waived, and we find no plain error.

### Prosecutorial Misconduct

**{¶59}** In proposition of law VIII, defendant argues that the prosecutor committed three acts of misconduct during closing arguments in the penalty phase. The test for prejudice in closing arguments is " 'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.' " *State v. Hessler*, 90 Ohio St.3d 108, 125, 734 N.E.2d 1237, quoting *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883.

**{¶60}** First, defendant argues that the prosecutor treated the nature and circumstances of the offense as an aggravating circumstance. Defendant points to the following segment of the prosecutor's argument: "As a part of the nature and circumstances of this horrendous crime, I'm not going to reiterate the details, the medical evidence that you have before you, the photographic evidence, the physical evidence that you heard from Dr. Barnett, but this murder, Your Honors, this

murder is the essence of depraved and evil behavior, and that's what makes the death penalty necessary." However, the defense failed to object to the prosecutor's argument, and waived all but plain error. *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

**{¶61}** The state may "present arguments concerning the nature and circumstances of the offense." *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 355, 662 N.E.2d 311. However, "[i]t is improper for prosecutors in the penalty phase of a capital trial to make any comment * * * that the nature and circumstances of the offense are 'aggravating circumstances.' " Id. at paragraph two of the syllabus.

**{¶62}** The prosecutor correctly identified the two statutory aggravating circumstances the court could properly consider (i.e., aggravated burglary and aggravated robbery under R.C. 2929.04[A][7]) at the beginning of her argument.

**{¶63}** Perusal of the panel's opinion demonstrates that the trial court correctly identified the aggravating circumstances as aggravated murder that occurred during an aggravated burglary and an aggravated murder that occurred during an aggravated robbery. When a trial court correctly identifies the statutory aggravating circumstances, it will be inferred that the trial court " 'understood the difference between statutory aggravating circumstances and facts describing the nature and circumstances of the offense.' " *State v. Green* (1993), 66 Ohio St.3d 141, 149, 609 N.E.2d 1253, quoting *State v.* Sowell (1988), 39 Ohio St.3d 322, 328, 530 N.E.2d 1294. Therefore, we find no plain error resulting from the prosecutor's comments.

**{¶64}** Second, defendant argues that the prosecutor's final argument impugned the defense counsel's integrity. Here, defendant points to the following segment of the prosecutor's argument: "None of us envy your jobs, or a jury in a situation like this, but you have that job, as all of us here in this system of justice; Mr. Sniderman and I to prosecute honestly, ethically and to the best of our abilities with the evidence we have through the investigators; Mr. Cimerman and Mr.

Helmick to zealously advocate and defend their client; and the three of you to be objective, to use the evidence before you, and combine it with your unique understanding of the law. And we know that you will do that." However, the defense failed to object to the prosecutor's argument and waived all but plain error. *State v. Wade*, 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

{¶65} The test for prejudice regarding prosecutorial misconduct in closing arguments is " 'whether the remarks were improper and, if so, whether they prejudicially affected the substantial rights of the defendants.' " *State v. Hessler,* 90 Ohio St.3d 108, 125, 734 N.E.2d 1237, quoting *State v. Smith,* 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. Here, the prosecutor's argument summed up the professional responsibilities of the defense, prosecution, and the three-judge panel. The prosecutor did not say anything negative about defense counsel or otherwise impugn defense counsel's integrity. Moreover, the prosecutor's remarks did not improperly contrast defense counsel's zeal with the state's honest and ethical conduct of the case. Therefore, the prosecutor's remarks were proper. We find no plain or other error, and reject this argument.

{¶66} Finally, defendant claims that the prosecutor improperly argued that the three-judge panel should defer to decisions of this court when weighing mitigating factors against the aggravating circumstances.

{¶67} The prosecutor argued that the panel should consider the weight given to mitigating evidence in several capital decisions of the Supreme Court of Ohio when weighing mitigation in defendant's case. However, the defense never objected to that argument and waived all but plain error. *State v. Wade*, 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

{¶68} R.C. 2929.03(D)(1) neither requires nor forbids the court to consider evidence determined to be mitigating in similar cases. However, the sentencing procedures in R.C. 2929.03(D)(1) were designed to promote the objective

consideration of the circumstances of the individual offense and individual offender. Asking the three-judge panel to make comparisons with other cases did not constitute prejudicial error, since it is presumed that the panel "considered only the relevant, material, and competent evidence in arriving at its judgment." *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 239 N.E.2d 65.

{¶69} Moreover, the sentencing opinion shows that the trial court properly assessed defendant's mitigating factors in accordance with R.C. 2929.04(B). Thus, we find no plain error, and this argument is without merit.

{¶70} In summary, we find no prosecutorial misconduct justifying reversal, and we reject proposition VIII.

### Ineffective Assistance of Counsel

{¶71} In proposition of law X, defendant claims that he received ineffective assistance of counsel when his trial counsel failed to preserve error by making timely objections. However, defendant fails to mention any specific example of counsel's ineffectiveness at trial.

{¶72} Earlier in our discussion, we found the specific allegations of ineffective assistance of counsel in propositions II and VII to have no merit. Moreover, our review of the remaining portions of the record discloses no evidence of ineffective assistance of counsel affecting the ultimate outcome of the trial. Therefore, we reject proposition X.

### Sentencing Opinion

{¶73} In proposition of law IX, defendant contends that the trial court improperly weighed the aggravating circumstances against the mitigating factors.

{¶74} First, defendant claims that the panel erred by weighing the aggravating circumstances against the mitigating factors individually rather than collectively. Since the panel found only one mitigating factor, defendant's limited intellect, to weigh against the aggravating circumstances, there was no error.

**{¶75}** Second, defendant argues that the panel treated the nature and circumstances of the offense as an aggravating circumstance. However, the panel's sentencing opinion showed that it understood the difference between the statutory aggravating circumstances and facts describing the nature and circumstances of the offense. See, also, *State v. Clemons* (1998), 82 Ohio St.3d 438, 447, 696 N.E.2d 1009. Thus, we find that this argument is also without merit.

**{¶76}** Defendant also argues that the trial court improperly weighed defendant's "history, character, and background" against "the invalid aggravating circumstance of the nature and circumstances of the offense." Here, defendant points to the following segment of the sentencing opinion:

**{¶77}** "While Mr. Thomas' life and his experiences have been unlucky, wretched, unfortunate, unhappy, counteractive and, perhaps, even disastrous, they are not unusual, exceptional, rare or even uncommon. Many other persons who have endured similar experiences in their lives have not resorted to such violent and savage behavior.

**{¶78}** "The panel, therefore, finds nothing in the defendant's character, background, and history to mitigate the barbarous, inhumane and pitiless massacre of this unfortunate, hapless eighty-seven year old lady."

**{¶79}** R.C. 2929.04(B) required the three-judge panel to weigh the aggravating circumstances against the "nature and circumstances of the offense, the history, character, and background of the offender," and other mitigating factors set forth in R.C. 2929.04(B)(1) through (7). A careful reading of the panel's opinion demonstrates that it found that defendant's history, character, and background were entitled to no weight in mitigation. This was a proper conclusion. See *State v. Stumpf* (1987), 32 Ohio St.3d 95, 101, 512 N.E.2d 598; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus.

**{¶80}** The panel's remark that it found "nothing in the defendant's character, background, and history to mitigate the barbarous, inhuman and pitiless

massacre" was an unnecessary reference to the nature of the offense. However, this reference and other misstatements in the sentencing opinion are harmless error. The panel properly weighed the aggravating circumstances against the only mitigating factor that it found, defendant's limited intellectual abilities.

{¶81} Finally, defendant claims that the panel improperly discounted mitigating evidence of his "disastrous" life and experiences, and ignored the mitigating fact that giving defendant "the maximum consecutive sentences would have rendered him first *eligible* for parole at age 82." (Emphasis sic.) There is "no requirement" that the trial court explain "how it decides how much weight to give to any one factor." Moreover, "[t]he weight, if any, given to a mitigating factor is a matter for the discretion of the individual decisionmaker." *State v. Filiaggi,* 86 Ohio St.3d 230, 245, 714 N.E.2d 867. Thus, the panel could reasonably assign whatever weight, if any, thought to be appropriate for that mitigating evidence.

{¶82} Furthermore, our independent reassessment of the sentence will eliminate the effect of any deficiencies found in a trial court's sentencing decision. *State v. Fox* (1994), 69 Ohio St.3d 183, 191-192, 631 N.E.2d 124. For these reasons, we reject proposition IX.

### Weighing of Aggravating Circumstances and Mitigating Factors

{¶83} In proposition of law XIV, defendant argues that his death penalty must be vacated because the aggravating circumstances do not outweigh the mitigating factors. We will address defendant's argument when we independently review defendant's death sentence.

### Proportionality

{¶84} In proposition of law XIII, defendant argues that the proportionality review of his sentence should not be limited to those cases where the death sentence has actually been imposed. We summarily reject this claim. See *State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

{¶85} In proposition of law XV, defendant argues that his death sentence is disproportionate to death sentences in other cases. We will address the proportionality of defendant's death sentence during our sentence evaluation.

### Constitutional Issues

{¶86} In proposition of law XI, defendant disputes the constitutionality of Ohio's death-penalty statutes. We reject these claims. See *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *State v. Clemons*, 82 Ohio St.3d at 454, 696 N.E.2d 1009; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 179, 15 OBR 311, 473 N.E.2d 264.

### Independent Sentence Evaluation

{¶87} *Aggravating circumstances*. The evidence established that defendant was properly convicted of two death-penalty specifications under R.C. 2929.04(A)(7), namely committing murder during an aggravated burglary, and committing murder during an aggravated robbery.

{¶88} *Mitigation evidence*. Defendant called two mitigation witnesses, provided his own unsworn statement, and introduced documentary evidence. His counsel also argued mitigating factors for the panel's consideration during final argument.

{¶89} Dr. Jeffrey Smalldon, a clinical psychologist, stated that defendant had a long history of learning problems, an extensive history of alcohol and drug abuse, and a history of family alcoholism.

{¶90} Defendant attended school in rural Tennessee when the schools were first being integrated. Defendant repeated the first, second, and seventh grades and then dropped out of school. According to Smalldon, defendant's educational testing results at the ages of 10 and 12 suggested an "overall intellectual functioning somewhere in either the mildly retarded or what's called the borderline range of intellectual * * * functioning."

{¶91} Defendant was hit in the head with a baseball bat in 1981. Medical records from the injury showed that defendant suffered "anterograde amnesia," and a variety of symptoms associated with postconcussion syndrome. Defendant did not suffer a skull fracture, although he remained hospitalized for three or four days.

{¶92} Testing in 1982 showed that defendant had an IQ of 72. The psychologist administering the IQ test strongly suspected that defendant suffered some degree of "organic or structural brain impairment." However, defendant never received followup neurological testing to complete the diagnosis.

{¶93} Testing conducted when defendant applied for Social Security disability benefits in 1993 showed that defendant had an IQ of 52. However, Smalldon questioned the validity of these test results, since defendant may have been motivated to perform poorly on the test to qualify for disability benefits. Smalldon's "best estimate of his IQ, if he was doing his best," was "probably at the low end of the borderline range," in the low 70s.

{¶94} Tests administered by Smalldon before trial showed that defendant's word recognition and spelling were at the first-grade level, and his arithmetic skills were at the third-grade level. According to Smalldon, "there's no question * * * [that] Mr. Thomas has very significant intellectual deficits, deficits that place him in the cusp of the mildly retarded and low borderly [borderline] ranges of intellectual functioning."

{¶95} Other testing showed defendant's tendency toward very concrete and overly simplistic thinking and "very poor logical and sequential reasoning abilities." Further testing showed that defendant suffered from a "deficit, the sort that's most frequently associated with the right cerebral hemisphere and * * * spatial orientation," which Smalldon implied could be related to the injury from the baseball bat in 1981.

{¶96} Smalldon stated that defendant was "capable of planning [the crime] on some level." However, "[i]f it was * * * an attempt to undertake complex

planning it would be without a full appreciation for the long term implications of what he is doing. It would be a here and now kind of focus. So he would be able to plan, but in a very limited way in my opinion." Smalldon also stated, "I have no reason to believe * * * that Mr. Thomas was unable to distinguish between right from wrong at the time this offense occurred." Moreover, defendant's intoxication at the time of the offense would have had the effect of further eroding his behavioral controls.

{¶97} During cross-examination, Smalldon confirmed that he had information on defendant's criminal record that predated the 1981 baseball bat injury. These offenses included receiving stolen property in 1978, criminal trespass in March 1980, breaking and entering in April 1980, disorderly conduct in June 1980, criminal damaging in August 1980, menacing in March 1981, breaking and entering in April 1981, shoplifting in May 1981, and disorderly conduct in June 1981.

{¶98} Dr. Janice Ort, a clinical psychologist, conducted psychological testing on defendant. Defendant "scored in the mentally retarded range of intellectual functioning" on the Wechsler Adult Intelligence Scale—Revised ("WAIS-R") test. Defendant's score fell "somewhere within about the range of 65 to 69." However, Ort felt that after "observing his behavior and his level of engagement in this test, it was very likely that that was somewhat of an underestimation of his actual level of intellectual functioning." Ort stated that defendant "would feign sleeping during some of the administrations and had to be aroused to participate and to answer."

{¶99} Defendant scored even lower on the Stanford-Binet test, with a composite score of 58. Defendant's scores showed that his "vocabulary was at the age equivalent of 7 years old, while his comprehension abilities were at an age equivalent level of an 8 year old."

{¶100} According to Ort, defendant reported auditory hallucinations and "often heard the devil speaking to him." Defendant described the devil as "a brother of his who had been killed by his father." In response to a number of questions, defendant stated that it was "his brother who seemed to be the voice of the devil, who seemed to be responsible for the troubles in his life." Defendant also described memory losses that were related to substance abuse, a relatively high number of somatic complaints, bizarre sensory experiences, strong feelings of persecution, and strong feelings of alienation.

{¶101} Defendant's responses to the Rorschach inkblot test indicated that "his thinking is seriously disturbed, that it's characterized by very flawed judgment, flawed conceptualizations and often includes disorganized and inconsistent decision making patterns." Testing indicated that defendant is "not bothered by a lot of the internal states and feelings that tend to motivate most people."

{¶102} Defendant attended segregated schools in Tennessee until the fourth grade. Defendant did not receive any kind of special education for his learning disabilities because such programs were not available when he was in school. Defendant's school record shows that he received mostly C's and F's until he dropped out of school the year after his second year in the seventh grade. After reviewing all of his previous IQ test scores, Ort stated that "it's likely * * * that his full scale IQ falls somewhere within the high 60's to very low 70's."

{¶103} Defendant was one of nine children. Defendant's father was an alcoholic, and the family was impoverished. Everyone in the family would often cut cotton to help supplement the family's income. One of defendant's brothers threatened other family members throughout their lives. He eventually threatened their father, who killed him in self-defense. Another brother was reported to have been institutionalized in Chicago. Defendant's mother was a very religious woman, and he described her as "sanctified."

**{¶104}** Defendant described his substance abuse as primarily alcohol, although in his thirties he used marijuana and crack. In Ort's opinion, defendant "has an alcohol dependence problem, a cannabis problem, cocaine dependence."

**{¶105}** Ort also found that defendant has "a personality disorder" that does not meet any of the "specific diagnostic criteria, so he's diagnosed with a personality disorder not otherwise specified." Ort stated that defendant's "functioning falls probably more in the borderline range of functioning towards the lower end." Moreover, Ort thought it was "likely that his verbally based skills, * * * in terms of comprehension, social judgments, * * * tip more into the range of mental retardation." However, Ort also stated, "I think he's capable of knowing right from wrong."

**{¶106}** During cross-examination, Ort agreed that defendant's criminal record included disorderly conduct, resisting or interfering with arrest, unauthorized use of property, a drug paraphernalia charge in September 1989, attempted breaking and entering in December 1989, and gross sexual imposition in February 1990. Defendant also committed various behavioral infractions (i.e., not completing work assignments and possession of contraband) while imprisoned at the Mansfield and Lebanon Correctional Facilities.

**{¶107}** Defendant was placed into the Volunteers of America halfway house program after being released from prison. Reports indicated that he abstained from alcohol, completed job training, and committed no violations. However, defendant had difficulty maintaining sobriety and staying employed after leaving that structured environment.

**{¶108}** In his unsworn statement, defendant said, "I'm sorry if I have hurt anyone, hurt that lady, their peoples. But like I said before, I don't remember none of this, and that's the only thing I can say. I'm sorry for what I did. I don't remember none of this."

{¶109} During the final argument in the penalty phase, defendant's counsel argued that if defendant were given a life sentence, his first hope of parole eligibility would occur when he was 82 years old. Counsel also pointed out that six states absolutely prohibit the execution of the mentally retarded.

{¶110} *Victim-impact evidence.* Following defense mitigation, Rosalyn Nagel and Carolyn Cook, the victim's daughters, presented a joint statement. They described their mother as a "kind and gentle lady who treated everyone she met with compassion and understanding." Newbirt treated defendant with kindness by giving him "a few dollars to perform small jobs in her yard, that she really did not require." Nagel stated that Newbirt "suffered each of those 30 days in the hospital. And her family, children, grandchildren, and great-grandchildren watched her dying and suffered with her each day." In a separate statement, Cook repeated many of the same sentiments about her mother. She stated that Newbirt was a "dear sweet lady who was where she wanted to be, where she should have been, loving her life and loving her family."

{¶111} Both statements expressed the daughters' feelings about the nature of the crime, and defendant's character. Nagel described the offense as a "despicable violent crime that was an ultimate act of a bully." She stated, "Each member of our family hopes that he will suffer the same terror as our mother suffered when he entered her bedroom and struck her again and again as she begged for her life." Cook stated that defendant committed an "unthinkable, unspeakable crime." About the defendant, she said, "If given the same set of circumstances, he will commit another unthinkable, unspeakable crime."

**Sentence Evaluation**

{¶112} We find nothing in the nature and circumstances of this offense to be mitigating. Defendant broke into Newbirt's home in the middle of the night, entered her bedroom, brutally attacked Newbirt by hitting her in the head with a hammer, and stole her television. After fleeing, defendant attempted to sell the

television. Thus, the facts establish a senseless murder that lacks any mitigating features.

{¶113} Defendant's history and background provide modest mitigating features. Defendant grew up as one of nine children born to a rural, impoverished family in Tennessee. Defendant did poorly in school and dropped out of school completely after the seventh grade. His father was reportedly an alcoholic. One of defendant's brothers was killed by his father in self-defense. Defendant has a long history of drug and alcohol abuse.

{¶114} The statutory mitigating factors are generally inapplicable, including R.C. 2929.04(B)(1) (inducement by the victim); (B)(2) (duress, coercion, or strong provocation), (B)(4) (youth of the offender)—defendant was 38 at the time of the offense, (B)(5) (lack of a criminal record)—defendant had a lengthy criminal record including breaking and entering, receiving stolen property and gross sexual imposition, and (B)(6) (accomplice only).

{¶115} Defendant's intellectual deficiencies and possible brain dysfunction do not qualify as a mental disease or defect under R.C. 2929.04(B)(3). See *State v. Gumm* (1995), 73 Ohio St.3d 413, 432, 653 N.E.2d 253. However, defendant's limited intellect is entitled to significant weight in mitigation under R.C. 2929.04(B)(7). Here, we wish to emphasize that the consideration of a defendant's intellectual deficiencies under the (B)(7) (catchall) rather than (B)(3) (mental disease) does not lessen the importance attributed to the evidence during the weighing process. *State v. Otte* (1996), 74 Ohio St.3d 555, 567, 660 N.E.2d 711 (in weighing the mitigation potential of addiction under [B][7], it did "not matter under which statutory category it was considered").

{¶116} On June 20, 2002, the United States Supreme Court ruled that execution of mentally retarded persons convicted of capital crimes is unconstitutional. *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. Of the states that currently prohibit execution of the mentally

retarded, the majority define "mental retardation" in terms of an IQ of 70 or below. See, e.g., Neb.Rev.Stat. 28-105.01(2), N.M. Stat. 31-20A-2.1, N.C.Stat. 15A-2005, S.D. Codified Laws 23A-27A-26.1, Tenn.Code 39-13-203(b), Wash.Rev.Code 10.95.030(2).

{¶117} Clinical definitions of mental retardation require subaverage intellectual functioning, and significant limitations in adaptive skills such as communication, self-care, and self-direction that become manifest before age eighteen. We note that there was little evidence in the record regarding defendant's adaptive skills.

{¶118} "Mild mental retardation" is typically used to describe people with an IQ level of 50 or 55 to approximately 70.[2] According to Dr. Smalldon, defendant's IQ was in the very low 70s, placing him on the cusp of the mildly retarded and low borderline ranges of intellectual functioning. Dr. Ort provided similar testimony and estimated that his IQ was in the "high 60's to very low 70's." However, evidence of defendant's mental deficiencies might be traced to his 1981 injury, when Thomas was in his mid-20s, and would therefore not meet the definition of "mental retardation" of most states that prohibit execution of the mentally retarded. Although the trial court found that defendant's 1981 baseball bat injury had no lasting effect, the trial court found that defendant is not retarded.

{¶119} We also note that experts administering other tests believed at times that defendant was feigning mental retardation. For example, testing conducted when defendant applied for Social Security disability benefits in 1993 showed that defendant had an IQ of 52, but Smalldon questioned the validity of these tests since defendant may have been motivated to perform poorly on the test to qualify for disability benefits. On the Wechsler Adult Intelligence Scale-Revised test, Ort testified that defendant's score fell "somewhere within about the range of 65 to 69."

---

2. *Atkins*, supra, at footnote 3, citing definitions of "mental retardation" adopted by the American Association of Mental Retardation and the American Psychiatric Association.

However, Ort believed that after "observing his behavior and his level of engagement in this test, that that was somewhat of an underestimation of his actual level of intellectual functioning," since defendant "would feign sleeping during some of the administrations and had to be aroused to participate and answer."

{¶120} Accordingly, we conclude that the expert testimony did not establish that defendant was mentally retarded. However, if defendant has additional information to present under the new test set forth by the United States Supreme Court in *Atkins v. Virginia*, he is free to file for post-conviction relief under the standards set forth by this court in *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, decided today.

{¶121} Further, despite his low IQ and head injuries, defendant was able to distinguish right from wrong as noted by Smalldon and Ort, who examined him. Cf. *State v. Gumm*, 73 Ohio St.3d at 432-433, 653 N.E.2d 253; *State v. Hill* (1992), 64 Ohio St.3d 313, 335, 595 N.E.2d 884. Ort agreed that despite his mental deficiencies, defendant was capable of functioning in the community. Evidence also indicates that defendant was intoxicated or on drugs when he murdered Newbirt, and thus his drug and alcohol abuse significantly contributed to his behavior on the night of the crime.

{¶122} Defendant's unsworn statement provides only slight mitigation. In his unsworn statement, defendant stated that he did not remember what he did on the night of the crime, so he expressed sorrow "if I have hurt anyone." The evidence does not suggest any other mitigating factors under R.C. 2929.04(B)(7).

{¶123} In summary, we find that the aggravating circumstances, i.e., the murder was committed during a burglary and a robbery, outweigh the mitigating factors beyond a reasonable doubt. Undoubtedly, defendant's intellectual deficiencies and difficult childhood are entitled to significant weight in mitigation. Moreover, defendant's alcohol and substance abuse affected his judgment and played a role in the murder. However, the facts surrounding the aggravating

circumstances show a brazen, callous robbery and burglary committed in connection with the brutal murder of a helpless, 87-year-old lady. Therefore, we find that the death sentence in this case is appropriate.

{¶124} Finally, we find that the death penalty imposed for the aggravated murder of Newbirt is appropriate when compared with other burglary-murder and robbery-murder cases. See *State v. Jones* (2000), 90 Ohio St.3d 403, 739 N.E.2d 300; *State v. Stallings* (2000), 89 Ohio St.3d 280, 731 N.E.2d 159; *State v. Spivey* (1998), 81 Ohio St.3d 405, 692 N.E.2d 151; *State v. Murphy* (1992), 65 Ohio St.3d 554, 605 N.E.2d 884*; State v. Slagle* (1992), 65 Ohio St.3d 597, 605 N.E.2d 916; *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293; and *State v. Barnes* (1986), 25 Ohio St.3d 203, 25 OBR 266, 495 N.E.2d 922.

{¶125} Accordingly, we affirm the defendant's convictions and sentence of death.

Judgment affirmed.

MOYER, C.J., DOUGLAS, J.J. SWEENEY, F.E. SWEENEY and PFEIFER, JJ., concur.

COOK, J., concurs in judgment only.

JAMES J. SWEENEY, J., of the Eighth Appellate District, sitting for RESNICK, J.

_____

**APPENDIX**

{¶126} First Proposition of Law: A trial court commits error by failing to find that a defendant is not competent to stand trial where he is unable to assist in his own defense.

{¶127} Second Proposition of Law: A defendant who is unable to assist in his own defense receives ineffective assistance of counsel when his trial attorneys do not ask the trial court to hold a hearing or order a psychiatric examination to determine whether the defendant is competent to stand trial.

**{¶128}** Third Proposition of Law: A capital defendant's waiver of trial by jury will not be considered knowing, intelligent, and voluntary unless the record affirmatively demonstrates that he understood the effects of his waiver including, in particular, that virtually any error which might be committed by a three-judge panel will be considered waived for appellate purposes.

**{¶129}** Fourth Proposition of Law: A trial court does not have jurisdiction to try a defendant without a jury where the jury waiver is neither journalized [n]or accompanied by a properly executed judgment entry authorizing trial by a three judge panel.

**{¶130}** Fifth Proposition of Law: A trial court commits erred [sic] by failing to ask a criminal defendant whether he (1) is aware that he has an absolute right to testify in his own behalf, and (2) whether he knowingly, intelligently, and personally waives that right.

**{¶131}** Sixth Proposition of Law: A trial court commits error to the prejudice of a criminal defendant where it permits a witness to render an expert opinion when that witness has not been qualified as an expert as required by Evid.R. 702.

**{¶132}** Seventh Proposition of Law: A criminal defendant is denied his right to effective assistance of counsel when trial counsel fails to object to the testimony of a witness who renders an expert opinion without being qualified as required by Evid.R. 702.

**{¶133}** Eighth Proposition of Law: A capital defendant is deprived of a fair sentencing determination when the prosecutor during closing argument at the mitigation phase of the trial:

**{¶134}** 1. Treats the nature and circumstances of the offense as an aggravating factor;

**{¶135}** 2. Characterizes the functions of the parties in the courtroom in such a way as to indicate that defense counsel are unethical; and

{¶136} 3. Urges the court not to conduct its own weighing of aggravating and mitigating factors but to defer to the decisions of this court.

{¶137} Ninth Proposition of Law: A three-judge panel violates its duty and also the constitutions of the United States and of the state of Ohio by imposing a sentence of death upon weighing the aggravating circumstances collectively against the mitigating factors individually and by weighing the nature and circumstances of the offense against the mitigating factors.

{¶138} Tenth Proposition of Law: A defendant in a capital case receives ineffective assistance of counsel when his trial counsel fails properly to preserve error by making timely objection.

{¶139} Eleventh Proposition of Law: Constitutional defects in Ohio's death penalty statutes require that a trial court should dismiss death penalty specifications.

{¶140} Twelfth Proposition of Law: An accused's right to due process under the Fourteenth Amendment to the United States Constitution is violated when the state is permitted to convict upon a standard of proof below proof beyond a reasonable doubt.

{¶141} Thirteenth Proposition of Law: Mandated proportionality review of death sentences should not include in the sample to be reviewed only those case[s] where the punishment of death was imposed.

{¶142} Fourteenth Proposition of Law: A trial court errs when it wrongly concludes that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

{¶143} Fifteenth Proposition of Law: A death sentence must be appropriate and proportional.

_____

Jeffrey M. Gamso and Spiros P. Cocoves, for appellant.

_____