[Cite as *State v. Brooks*, 2012-Ohio-1725.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  |  | JUDGES: |
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. John W. Wise, J. |
| Plaintiff-Appellee | : | Hon. Julie A. Edwards, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2011-CA-59 |
| LEANDER B. BROOKS | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:        Criminal appeal from the Richland County
Court of Common Pleas, Case No. 2010-
CR-0812H

JUDGMENT:        Affirmed

DATE OF JUDGMENT ENTRY:        April 18, 2012

APPEARANCES:


For Plaintiff-Appellee        For Defendant-Appellant

JAMES J. MAYER        CHARLES M. BROWN
RICHLAND COUNTY PROSECUTOR        76 Mulberry Street
BY: JILL M. COCHRAN        Mansfield, OH  44902
38 South Park Street
Mansfield, OH  44902

*Gwin, P.J.*

{1}  A Richland County jury convicted appellant Leander B. Brooks of aggravated murder, aggravated burglary, aggravated robbery, tampering with evidence and receiving stolen property. The jury acquitted Brooks of murder, burglary, two counts of kidnapping and all firearm specifications.

## Facts and Procedural History

{2}  The decedent Larry Plott, Jr. was on disability for a degenerative disk disease caused by diabetes. He was planning to sell his house and move to Chile. Plott had visited the country during his seven years in the Marine Corps. Plott hoped that the warmer climate would be better for his health.

{3}  Because of the pain that he suffered in his back, Larry Plott used marijuana on a regular basis. He also used crack cocaine. Plott began to sell crack cocaine beginning in 2009. Paula Timko introduced Plott to Warren Pitts, aka "Slim", and Brooks, aka "C-Cool," both of whom lived with Plott for a time and whom witnesses believed helped Plott get established in selling crack cocaine.

{4}  After unsuccessfully attempting to contact Plott by telephone and after stopping by his residence on several occasions, Plott's brother Ron Eusey and his friend David Lavelle went to Plott's house on May 23, 2010 concerned about his well-being. Outside of the home, they noticed that the lawn had not been mowed. In the driveway was a piece of glass shelving that appeared to come from Plott's entertainment center. Another shelf appeared to have been shattered on the front walk and had not been swept up. On the front door, two UPS stickers indicated failed deliveries on Thursday May 20 and Friday May 21. Having found these things

unchanged from the prior visits and aware of Plott's medical conditions, Ron and David became concerned. Ron entered Plott's garage through a broken panel on the garage door. Plott's vehicle was located inside of the garage.

{5}     Ron entered the house through the unlocked garage door and immediately saw what appeared to be spilled cocoa powder or paint all over the home. He noticed a trail of the stain leading down the hall to Plott's bedroom. The bedroom had been ransacked. Plott's body was found inside the bathroom of the bedroom. Plott was lying in a massive pool of blood that spread out from his head/shoulder area. Ron left the house, making deliberate attempts to avoid the stains he now recognized as blood. On his way out of the house, Ron noticed that the living room had also been ransacked and Plott's television was missing. Ron Eusey called the police.

{6}     Larry Plott, Jr. had been severely beaten. He had bruises on both sides of his chin and two black eyes. He had five lacerations to the face and head that went down to the bone. These lacerations about the head area appeared to have been caused by blunt force trauma from a long straight object either striking Plott or from Plott striking this object. His skull had been fractured and the bruising above the fracture appeared to contain the pattern from a shoe print. Plott had also been stabbed twice, once to the neck and once to the left flank. Plott sustained injuries to both arms and hands including breaks to both arms and several fingers. The medical examiner classified these injuries as classic defensive wounds. While the stab wounds might have been fatal if left untreated, the large head wound, apparently made when someone had stomped on Plott's head, was the lethal wound. Plott could have survived with these wounds for a period of time, even been able to move around, before succumbing.

**{7}** Plott's house had been ransacked. His large flat screen television was missing along with the television stand and the Playstation gaming system. Plott's desktop computer was also missing as well as other personal items. His pants pockets had been turned out. The police found a gun with a missing handle jammed into the plaster wall near Plott's body.

**{8}** The police immediately began to receive leads into the circumstances surrounding Plott's death. They spoke to Paula Timko, a friend of Plott's, who was in jail for a traffic offense at the time of Plott's death. This interview led police to suspect Warren Pitts and Brooks of being involved with the crime.

**{9}** Police next interviewed Warren Pitts who was cooperative with the investigators, volunteering his DNA, fingerprints and shoes. After interviewing Pitts, the police considered Brooks a person of interest. The police then received an anonymous tip that Brooks was in possession of some suspicious property.

**{10}** A warrant was issued for Brooks' arrest for burglary and receiving stolen property. The warrant was executed at the home that Brooks shared with his girlfriend, Leigha Riley. During Brooks' arrest, police were able to view a large flat screen television and a television stand matching the description of the one belonging to Larry Plott. A search warrant was subsequently issued. In addition to the television and television stand, the police located other property belonging to Plott including his computer, two watches, his cellular telephone, a blue glass pipe for smoking marijuana, and several bags and sets of tools.

**{11}** Plott's bedroom door had been kicked in and a footprint was found on the bedroom door. This footprint was consistent with a footprint found on the underside of

the television stand shelf removed from Brooks' home. It was also similar to several footprints made in blood at the crime scene. This footprint contained what appeared to be a Nike shoe logo.

**{12}** The gun that was found in the bathroom wall near Plott's body was identified by several people as being similar to one seen in Brooks' possession as recent as the Saturday before Plott's murder. Leigha and Warren Pitts both testified to having seen Brooks with a gun that had tape around the handle. Juan Billups testified that Brooks had told him to get in touch with Leigha before grand jury and tell her not to say anything about him possessing a gun. A DNA swab from the gun was consistent with a mix of Plott's DNA as a major contributor. Brooks could not be excluded as a contributor of the DNA with a likelihood being one in 47,480.

**{13}** Leigha Riley testified that Brooks had possession of her vehicle on Wednesday, May 19, 2010, while she was at work. Leigha's vehicle had a broken rear windshield wiper. A piece of plastic that appeared to have been broken off a vehicle was found in Larry Plott's garage after his death. This piece was found to be a match to the broken wiper on Leigha's vehicle. Tire prints on the glass shelf found in Plott's driveway matched the tires on Leigha's vehicle. It was verified through the Ashland police department that Leigha's vehicle was removed from impound on Wednesday, May 19, 2010 and through her work records that she worked from 3:59 p.m. to 9:00 p.m. that evening.

**{14}** When Brooks came to pick Leigha up from work on May 19, 2010 around 9:00 p.m., her vehicle was full of the items that the police later determined belonged to Larry Plott. Brooks also had close to two hundred dollars in cash, which Leigha testified

he did not have when he dropped her off for work that day. Brooks told Leigha that the items belonged to him, but his ex-girlfriend had been keeping them from him and he had finally convinced her to give them back to him.

{15}   Plott's best friend, Angela Garcia, visited Plott briefly after her shift at Wal-Mart ended at 3:00 p.m. on May 19, 2010. Angela smoked two cigarettes, Salem Slim Lights, and Plott smoked a cigar. Angela left two cigarettes for Plott. Nothing appeared to be missing from or out of place in the home at that time of her visit. No one else was present.

{16}   Brooks insinuated through cross-examination that Plott had given him the television and other items. The theory offered by Brooks was that Plott was planning to burn down his house to collect the insurance money and use that money to move to Chile and he had either given his possessions to Brooks to protect from the fire or to unload before moving.

{17}   The state presented evidence that Plott told his brother, Brian Scott, to make a list of items that he wanted because Plott intended to give Brian those items in exchange for rent. Plott intended to stay with Brian for a few months while he got his affairs in order and got the money together to move to Chile. In addition, evidence was presented that the only insurance that Plott had on the house would have benefitted the mortgage holder and further, the home still contained personal effects that Plott would have been more likely to save from fire rather than the other objects that were easily replaceable.

**{18}** Brooks also suggested that Plott was in trouble, because either authorities were getting close to his drug trafficking endeavor or because he owed some drug dealer or others, a lot of money and Plott was looking to move in a hurry.

**{19}** Brooks was arrested on a warrant for Burglary and Receiving Stolen Property on May 25, 2010. He was indicted in case number 10-CR-386 on June 11, 2010. This case consisted of one count of Burglary. A motion to suppress Brooks' statements to police was filed on August 6, 2010. This case was dismissed on December 8, 2010 because Brooks had been re-indicted on November 5, 2010 in the instant case. Brooks was charged with aggravated murder, murder, aggravated burglary, burglary, aggravated robbery, two counts of kidnapping, tampering with evidence and receiving stolen property. All of the charges, except for the tampering with evidence and receiving stolen property charges contained five-year firearm specifications.

**{20}** Brooks' motion to suppress was transferred to the instant case. After a hearing on the motion and supplemental briefs filed by both sides, the trial court granted the motion to suppress Brooks' statements to the police.

**{21}** After trial, the jury found Brooks guilty of aggravated murder, aggravated burglary, aggravated robbery, tampering with evidence and receiving stolen property. The jury acquitted Brooks of the other charges and all of the firearm specifications.

**{22}** On May 27, 2011, the trial court sentenced Brooks to forty-six (46) years to life in prison. Brooks received a sentence of thirty (30) years to life for the aggravated murder charge, ten years each on the aggravated robbery and aggravated burglary charges, five years on the tampering with evidence charge and one year on the charge

of receiving stolen property. The aggravated robbery and aggravated burglary charges were to be served concurrent to each other but consecutive to all other charges. All other charges were to be consecutively served.

{23} Appellant raises four assignments of error,

{24} "I. THE TRIAL COURT ERRED AND COMMITTED PLAIN ERROR IN PERMITTING EXPERT WITNESSES TO TESTIFY WITHOUT PROVING SPECIFIC QUALIFICATIONS OF THE EXPERTS SO TESTIFYING, IN VIOLATION OF OHIO RULE OF EVIDENCE 702, AND THE DEFENDANT-APPELLANT'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

{25} "II. THE TRIAL COURT ERRED AND COMMITTED PLAIN ERROR IN PERMITTING EXPERT WITNESSES TO TESTIFY AND RENDER OPINIONS NOT WITHIN A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY IN VIOLATION OF OHIO RULES OF EVIDENCE AND THE DEFENDANT-APPELLANT'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

{26} "III. THE TRIAL COURT ERRED AND COMMITTED PLAIN ERROR IN PERMITTING THE WITNESS THAT TESTIFIED CONCERNING A DOCUMENT WHEN HE WAS NOT THE PREPARER OF THE DOCUMENT AND SUCH DOCUMENT WAS NOT PROPERLY AUTHENTICATED IN VIOLATION OF THE DEFENDANT-APPELLANT'S RIGHT TO DUE PROCESS PROTECTION UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND IN ARTICLE 1, SECTION 16, OF THE OHIO CONSTITUTION.

**{27}** "IV. APPELLANT WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL BY THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10, OF THE OHIO CONSTITUTION, AS WELL AS THE DUE PROCESS PROTECTION UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND IN ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION."

I, II, III & IV

**Plain Error**

**{28}** Because no objections were made during his jury trial to the testimony that Brooks now claims was wrongly admitted, he agrees that we must review his allegations of error under the plain error standard.

**{29}** As the United States Supreme Court recently observed in *Puckett v. United States*, 526 U.S. 129, 129 S.Ct. 1423, 1428, 173 L.Ed.2d 266, (2009)

> If an error is not properly preserved, appellate-court authority to remedy the error (by reversing the judgment, for example, or ordering a new trial) is strictly circumscribed. There is good reason for this; "anyone familiar with the work of courts understands that errors are a constant in the trial process, that most do not much matter, and that a reflexive inclination by appellate courts to reverse because of unpreserved error would be fatal." (Citation omitted).

> "[A]n appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable

dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings'."

*United States v. Marcus*, 560 U.S. __, 130 S.Ct. 2159, 176 L.Ed.2d 1012(May 24, 2010) quoting *Puckett, supra* 129 S.Ct. at 1429.

{30}    The Ohio Supreme Court has previously held that,

"if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutiona[l] errors that may have occurred are subject to harmless-error analysis." *State v. Hill* (2001), 92 Ohio St.3d 191, 197, 749 N.E.2d 274, quoting *Rose v. Clark* (1986), 478 U.S. 570, 579, 106 S.Ct. 3101, 92 L.Ed.2d 460. Moreover, as we stated in *State v. Perry,* 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, "[c]onsistent **49 with the presumption that errors are not 'structural,' the United States Supreme Court 'ha[s] found an error to be "structural," and thus subject to automatic reversal, only in a "very limited class of cases." *Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citing *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel)); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased trial judge); *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial *392

of self-representation at trial); *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable-doubt instruction).'" *Perry,* 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 18, quoting *Neder v. United States* (1999), 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35.

*State v. Wamsley* 117 Ohio St.3d 388, 2008-Ohio-1195, 884 N.E.2d 459 (2008), ¶16.

### A. Expert Testimony- Qualifications of expert witness

**{31}** Brooks first claims that the trial court erred in permitting specific witnesses to testify as experts because the court failed to make a threshold determination concerning their qualifications.

**{32}** Evid.R. 702 provides:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports

the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

**{33}** In *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, the Supreme Court observed,

Neither special education nor certification is necessary to confer expert status upon a witness. "The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Hartman,* 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v. Baston,* 85 Ohio St.3d 418, 423, 709 N.E.2d 128. Pursuant to Evid.R. 104(A), the trial court determines whether a witness qualifies as an expert, and that determination will be overturned only for an abuse of discretion. *State v. Hartman,* 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 446 N.E.2d 444.

Id. at ¶ 46.

**{34}** In the case at bar, the trial court instructed the jury as follows,

Normally, a witness may not express an opinion. However, a person who follows a profession or a special line of work can sometimes express an opinion because of that person's specialized education, knowledge, and experience.

In this case, a substantial number of persons, Dro. [sic.] Lisa Kohler, Lindsey Nelsen-Rausch, Lynda Eveleth, Robert Ball, BCI Agents George "Ed" Staley, Michael Roberts, Martin Lewis, and Gary Fossaceca were permitted to express opinions in their professional areas of expertise. Such testimony is admitted for whatever assistance it may provide in helping you to arrive at a just verdict.

10T. at 1479.

### 1. Robert Ball

**{35}** In his first assignment of error, Brooks argues that Robert Ball, the chief investigator with the Richland County Coroner's Office was permitted to testify that Plott had been dead for three days and that Plott did not die immediately from the wounds that were inflicted upon him. Further, in his third assignment of error, Brooks argues that Ball was permitted to testify concerning the death certificate and autopsy report prepared in this case.

**{36}** While the state never formally tendered Ball as an expert, defendant's counsel never objected or challenged his qualifications to testify. Further, Brooks did not object to the admission of the death certificate, admitted as state's exhibit 10 or the coroner report, admitted as state's exhibit 11. (9T. at 1391-1395). Thus, Brooks waived

all but plain error. Crim.R. 52(B); *State v. Baston,* 85 Ohio St.3d 418, 423, 1999-Ohio-280, 709 N.E.2d 128.

{37} During Brooks' jury trial the parties stipulated that Dr. Lisa Kohler, the Medical Examiner who performed the autopsy of Plott be qualified to testify as an expert witness in the area of clinical, forensic and anatomic pathology. (6T. at 1028). Dr. Kohler testified that Plott had been dead for between two to four days before the May 24, 2010 autopsy was performed. (7T. at 1028; 1032-1033). She further testified that Plott sustained defensive injuries, and that he did not die immediately from his wounds. (7T. at 1040-1041; 1044). Dr. Kohler further testified to the contents of the autopsy report, which was admitted into evidence as state's exhibit 114.

{38} Thus, we find any error in the admission of Ball's testimony had little impact on the jury because it was largely cumulative of the remaining evidence. *State v. Conway,* 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 79. Thus, any improper admission of evidence in Ball's testimony was harmless beyond a reasonable doubt.

### 2. George Edward Staley, Jr.

{39} Mr. Staley is a special agent with the Ohio Bureau of Criminal Identification and Investigation. Among other duties, Staley photographed the crime scene. Brooks contends that it was error to allow Staley to testify to blood evidence depicted in the photographs of the crime scene. Specifically, to the location of various blood splatters throughout the home and that the blood evidence could indicate that an individual who was bleeding either crawled or was dragged down a hallway.

**{40}** Staley authenticated the photographs that he took while processing the crime scene. He testified that each photograph was a fair and accurate representation of what he observed at the crime scene on May 23, 2010. Staley further testified that he conducted a "presumptive test" on a representative sample of the stains that indicated the probability that the stains were blood. Staley further testified that he was aware the samples were later tested by BCI and determined in fact to be human blood.

**{41}** While the state never formally tendered Staley as an expert, defendant's counsel never objected or challenged his qualifications to testify. Further, Brooks did not object to the admission of the photographs or the test results of the stains found at the crime scene. (9T. at 1391-1395).

**{42}** We find any error in the admission of Staley's testimony had little impact on the jury because the jury was able to view the photographs and decide for themselves the weight to accord to them. It is obvious from the testimony of the coroner and other witnesses who had viewed the scene that blood was observed throughout the home. Thus, it was largely cumulative of the remaining evidence. *State v. Conway,* 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 79. Accordingly, any improper admission of evidence in Staley's testimony was harmless beyond a reasonable doubt.

### 3. Gary Fossaceca

**{43}** Gary Fossaceca is a special agent with the Ohio Bureau of Criminal Identification and Investigation. Brooks argues that Fossaceca was permitted to testify about the contents of Plott's computer as well as various cellular telephone records.

**{44}** Brooks does not cite to the record with specificity exactly what evidence was erroneously admitted from Plott's computer, and how the erroneously admitted computer evidence prejudiced him.

**{45}** App.R. 16(A)(7) states that appellant shall include in his brief "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies. The argument may be preceded by a summary."

**{46}** According to App. R. 12(A)(2), "The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App. R. 16(A)." An appellate court may rely upon App. R. 12(A) in overruling or disregarding an assignment of error because of "the lack of briefing" on the assignment of error. *Hawley v. Ritley*, 35 Ohio St.3d 157, 159, 519 N.E.2d 390, 392-393 (1988).

**{47}** Because Brooks fails to properly reference portions of the record supporting his claim, he cannot demonstrate the claimed error. See *Daniels v. Santic,* Geauga App. No.2004-G-2570, 2005-Ohio-1101, at ¶ 13-15. See, also, App.R. 12(A)(2) and 16(A)(7); *Graham v. City of Findlay Police Dept.* 3rd Dist. No. 5-01-32, 2002-Ohio-1215 (stating, "[t]his court is not obliged to search the record for some evidence of claimed error. * * * Rather, an appellant must tell the appellate court specifically where the trial court's alleged errors may be located in the transcript"); *State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees,* 108 Ohio St.3d

288, 2006-Ohio-903, at ¶ 13; *State ex rel. Petro v. Gold,* 166 Ohio App.3d 371, 2006-Ohio-943, at ¶ 94, *appeal not allowed*, 110 Ohio St.3d 1439, 2006-Ohio-3862, *reconsideration denied*, 111 Ohio St.3d 1418, 2006-Ohio-5083; *Porter v. Keefe,* 6th Dist. No. E-02-018, 2003-Ohio-7267, at ¶ 109-113.

**{48}** We find no plain error in Fossaceca's testimony about the contents of Plott's computer. His testimony related to the items he found on Plott's computer.

**{49}** However, Fossaceca further testified at trial concerning the contents of cellular telephone records created by Verizon Wireless. These records were never authenticated nor qualified as business records pursuant to Evid. R. 901 or Evid. R. 803(6).

**{50}** "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Hearsay is generally not admissible unless it falls within one of the recognized exceptions. Evid.R. 802; *State v. Steffen*, 31 Ohio St.3d 111, 119, 509 N.E.2d 383(1987). Evid.R. 803(6) provides a hearsay exception for regularly recorded business documents. "A telephone record or other such document can often fall with [in] the business record exception provided under 803(6)." *State v. Hirtzinger*, 124 Ohio App.3d 40, 49, 705 N.E.2d 395(1997); *State v. Knox*, 18 Ohio App.3d 36, 37, 480 N.E.2d 120(1984). However, Evid.R. 803(6) includes an authentication requirement which must be met before it applies,

> Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with

knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

{51} Thus, the rule requires that a custodian, or other qualified witness, testify as to the regularity and reliability of the business activity involved in the creation of the record. While the witness providing this foundational testimony need not have firsthand knowledge of the transaction, he or she must be sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance, and retrieval. *State v. Hirtzinger, supra,* 124 Ohio App.3d at 49, 705 N.E.2d 395.

{52} Fossaceca as a special agent for BCI did not have the requisite knowledge with respect to the operation of Verizon Wireless, which created the telephone records, nor did Fossaceca have knowledge about the circumstances of the record's preparation.

{53} The record in the case at bar establishes that the proper foundational testimony was not present to authenticate the Verizon Wireless records. Thus, the trial court erred by allowing evidence of the telephone records and the testimony concerning

their contents to be presented through special agent Fossaceca. However, the trial court's error in this regard did not result in plain error.

{54} Evid.R. 103 provides in relevant part, "(A) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected…." Error in the admission of testimony may be considered harmless where such testimony is cumulative of other, properly admitted testimony. *State v. Conway,* 109 Ohio St.3d 412, 848 N.E.2d 810, 2006-Ohio-2815, ¶ 59 (any error in admitting statements was harmless where testimony was cumulative of other testimony); *State v. Holloman,* 10th Dist. No. 06AP-01, 2007-Ohio-840, ¶ 33 (same).

{55} During Brooks' jury trial there were additional submissions of evidence that demonstrated the evidence contained in the Verizon Wireless records. At trial, Leigha Riley, David Lavelle, Angela Garcia, Ron Eusey and Cory Roth each testified to telephone calls and text messages that they had with either Brooks or Plott.

{56} Accordingly, Brooks cannot demonstrate that, but for the trial court's error with respect to the telephone records, the outcome of the trial would have been different.

### 4. Lynda Eveleth

{57} Brooks next objects to the testimony of Lynda Eveleth. Eveleth is a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation. Brooks' trial counsel stipulated to Eveleth's qualifications as an expert in the area of forensic DNA analysis. (9T. at 1380). Accordingly, we find no plain error and find further that

Eveleth's experience as a forensic scientist qualified her to testify at trial about the DNA analysis.

### B. Expert Testimony- Basis for expert testimony in a criminal case

**{58}**   In his second assignment of error, Brooks argues that the trial court committed plain error by admitting the opinion of the "three" expert witnesses in terms of "possibility" rather than in terms of a "reasonable scientific certainty or probability."[1]

**{59}**   Evid.R. 702(C) requires that an expert's testimony be based on "reliable scientific, technical, or other specialized information." In *State v. D'Ambrosio*, 67 Ohio St.3d 185, 616 N.E.2d 909(1993) the Supreme Court held that expert witnesses in criminal cases can testify in terms of "possibility" rather than in terms of "a reasonable scientific certainty or probability." In *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, the Supreme Court further noted,

> The treatment of such testimony involves "an issue of sufficiency, not admissibility." [*State v. D'Ambrosio*]; see also *State v. Jones* (2000), 90 Ohio St.3d 403, 416, 739 N.E.2d 300. "'Questions about the certainty of the scientific results are matters of weight for the jury.'" *State v. Allen,* 5th Dist. No. 2009-CA-13, 2010-Ohio-4644, 2010 WL 3784818, ¶ 157, quoting *United States v. Brady* (C.A.6, 1979), 595 F.2d 359, 363.

Id. at ¶ 77.

The Court further made clear that,

> Ohio has a split application of Evid.R. 702. Criminal cases adhere
>
> to the *D'Ambrosio* standard in allowing expert opinion in terms of

---

[1] Brooks does not specifically name the three witnesses in his second assignment of error. He does identify Lynda Eveleth in his first assignment of error claiming her testimony was based upon possibilities not certainty.

possibilities to be admitted under Evid.R. 702. In contrast, Ohio courts require expert opinions in civil cases to rise to the level of probabilities before being admitted under Evid.R. 702.

*Lang,* supra ¶ 81.

**{60}** Accordingly, Brooks' arguments that the trial court committed plain error by permitting expert witnesses to give opinions not couched within a reasonable degree of scientific certainty as set forth in his second assignment of error is rejected in its entirety.

### C. Ineffective assistance of trial counsel and cumulative error

**{61}** Brooks argues in his fourth assignment of error that the errors outlined in his first second and third assignments of error amount to ineffective assistance of counsel, either alone or collectively, requiring reversal.

**{62}** In *State v. Brown,* 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, the Ohio Supreme Court recognized the doctrine of cumulative error. However, as explained in *State v. Bethel,* 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 197, it is simply not enough to intone the phrase "cumulative error." *State v. Sapp,* 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 103.

**{63}** Here, appellant cites the doctrine of cumulative error, lists or incorporates the previous assignments of error, and gives no analysis or explanation as to why or how the errors have had a prejudicial cumulative effect. Thus, this assignment of error has no substance under *Bethel* and *Sapp.*

**{64}** Further, where we have found that the trial court did not err, cumulative error is simply inapplicable. *State v. Carter*, 5th Dist. No. 2002CA00125, 2003-Ohio-

1313 at ¶ 37. To the extent that we have found that any claimed error of the trial court was harmless, or that claimed error did not rise to the level of plain error, we conclude that the cumulative effect of such claimed errors is also harmless because taken together, they did not materially affect the verdict. *State v. Leonard,* 104 Ohio St.3d 54, 89-90, 2004-Ohio-6235, 818 N.E.2d 229, 270 at ¶ 185.

{65}    Finally, a claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180(1993); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373(1989).

**{66}** Because we have found no instances of error in this case, we find appellant has not demonstrated that he was prejudiced by trial counsel's performance.

## Conclusion

**{67}** Brooks' first, second, third and fourth assignments of error are overruled in their entirety and the judgment of the Court of Common Pleas, Richland County, Ohio, is affirmed.

By Gwin, P.J.,

Wise, J., and

Edwards, J., concur

_____

HON. W. SCOTT GWIN

_____

HON. JOHN W. WISE

_____

HON. JULIE A. EDWARDS

WSG:clw 0328

[Cite as *State v. Brooks*, 2012-Ohio-1725.]

IN THE COURT OF APPEALS FOR RICHLAND COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| LEANDER B. BROOKS | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | CASE NO. 2011-CA-59 |

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas, Richland County, Ohio, is affirmed. Costs to appellant.

_____

HON. W. SCOTT GWIN

_____

HON. JOHN W. WISE

_____

HON. JULIE A. EDWARDS