[Cite as *State v. Gillum*, 2022-Ohio-2005.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                          |   | JUDGES: |
|--------------------------|---|---------|
| STATE OF OHIO            | : | Hon. W Scott Gwin, P.J. |
|                          | : | Hon. William B. Hoffman, J. |
| Plaintiff-Appellee       | : | Hon. John W. Wise, J. |
|                          | : | |
| -vs-                     | : | |
|                          | : | Case No. 2021 CA 00063 |
| KALINA GILLUM            | : | |
|                          | : | |
| Defendant-Appellant      | : | OPINION |

CHARACTER OF PROCEEDING:   Criminal appeal from the Licking County
                           Court of Common Pleas, Case No. 2020
                           CR 00088

JUDGMENT:                  Affirmed

DATE OF JUDGMENT ENTRY:    June 13, 2022

APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

WILLIAM C.HAYES                       CARLY M. EDELSTEIN
Licking County Prosecutor             Assistant Public Defender
By: J. BRANDON PITT                   250 East Broad Street, Ste.1400
20 S. Second Street                   Columbus, OH  43215
Newark, OH 43055

*Gwin, P.J.*

{¶1} Defendant-appellant Kalina Gillum ["Gillum"] appeals her convictions and sentences after a jury trial in the Licking County Court of Common Pleas.

*Facts and Procedural History*

The State's Case

{¶2} On September 18, 2019, Gillum arrived at Licking Memorial Hospital ["LMH"] at 12:55 a.m., bleeding, with an umbilical cord "hanging out," but no baby. 1T. at 47.[1] When questioned, Gillum initially stated that, around 6:00 p.m. the day before she had cramping, heavy bleeding, and pain, but that she had not seen a baby. Id. at 48. Based on the condition of Gillum and that there was no baby accompanying her, hospital staff contacted 9-1-1. Id. at 49-50. After calling 9-1-1, hospital staff continued to treat Gillum by, among other things, giving her pain medications and blood transfusions. Id. at 51.

{¶3} Gillum had not arrived at the hospital alone that night. Braden Mull accompanied her. 1T. at 52. When Sergeant Travis Delancey of the Newark Police Department arrived, he was apprised of the situation and spoke to Mull. Id. at 108. After speaking with Mull, Sergeant Delancey contacted the Heath Police Department and gave them the address of Gillum and Mull.

{¶4} Deputy Tyler Watson responded to 127 Andover Road, Apt. A, Heath, Ohio 43056, the residence of Gillum and Braden Mull. 1T. at 120-121; 163-164. When Deputy Watson arrived at the scene, fire trucks had already arrived. Id. Deputy Watson testified

---

[1] For clarity, the transcript from Gillum's jury trial will be referred to as, "__T.__," signifying the volume and the page number.

that all entrances to the residence were locked and, due to the nature of the call, there was an extreme concern there was "something life-threatening" going on inside, so officers performed a forced entry. Id. at 122. Inside the residence, officers found, among other things, a trash bag that had a shoebox inside of it. At the time the shoebox was discovered, Deputy Watson was the only officer wearing gloves so he opened the box. He saw a bloody towel and, once he opened the towel, he found a "newborn" inside which he quickly transferred to the medical personnel. 1T. at 123; State's Exhibits 27(A) – 27(D). Medical personnel checked the newborn (subsequently named Cayden Gillum), but found no signs of a heartbeat or breathing. Id. at 144.

{¶5} Paramedic Steven Gregory was asleep at 2:00 a.m. when the station received an emergency call from law enforcement. Id. at 139-140. He explained that it takes him about thirty seconds to get out of bed, get dressed, and be ready to leave the station. Id. at 140. That morning, it took him just over five minutes from dispatch to arrive at the apartment. Id. at 142. When he arrived, he checked the baby and found neither a heartbeat nor chest movement. Id. at 144.

{¶6} Sergeant Craig Black of the Heath Police Department testified that Branden Mull gave his consent for the officers to make a second entry to his and Gillum's home. 1T. at 161. Inside he recovered a pair of scissors from the bathroom countertop that was used to cut the umbilical cord. 1T. at 169; State's Exhibit 9. Sergeant Black later met Mull in the parking lot and obtained Mull's cellular phone and passcode. 1T. at 175. Sergeant Black turned the phone and passcode over to Detective Fisher. 3T. at 527.

{¶7} Detective Bradley Fisher also of the Heath Police Department testified that Mull gave permission to search the apartment. 3T. at 520; State's Exhibit 23. Shortly

after Cayden was found, Detective Fisher questioned Gillum, who was still being treated at the hospital. 3T. at 525-526. The interview was recorded. Id. Mull was present during the interview and was questioned by Fisher. Id. Detective Fisher had collected Mull's cellular phone and had returned to the hospital to collect Gillum's. Id. at 525-526. Gillum gave the phone and passcode voluntarily to Detective Fisher. 3T. at 528-530.

{¶8} Detective Fisher reviewed and compared the two phones. Detective Fisher found that there had been a text conversation between the two during and after Cayden's birth that included a photograph. Id. at 531. The photo was of Cayden shortly after his birth. State's Exhibit 6. Detective Fisher found that the text message conversations contained on Mull's cell phone and Gillum's cell phone was not identical. Id. Specifically, he found that four texts messages that were contained in the conversation, as it existed on Mull's phone, did not appear on Gillum's phone. Among the texts that Gillum had deleted on her phone, but were still on Mull's phone, was one that had been sent by Gillum to Mull that read, "It was in the box because I wasn't waking up." 3T. at 550. Another text deleted from Gillum's phone read, "Braden, it's moving." Id. at 552-553. Gillum had also deleted from her phone the photo of Cayden with the text "helppp" [sic.] attached to the photo. Id. 545. Detective Fisher also read a text message sent at 2:34 a.m. from Mull saying, "So the police are opening an investigation." 3T. at 543.

{¶9} Dr. Charles Lee, the Chief Forensic Pathologist and Deputy Coroner with the Licking County Coroner's Office, testified he had performed the autopsy on Cayden. 2T. at 245. He took a chest x-ray and did not find evidence of air in the windpipe, lungs, or stomach. Id. at 253; 303. He submerged the baby's lungs in water and they sank. Id. at 302. He testified that lungs floating would have been a sign that the baby might have

taken a breath. Id. at 253-254. He reviewed slides of the baby's lung tissue and found no evidence of air. Id. at 303. Dr. Lee made a finding of "fetal death" and issued a fetal death certificate. Id. at 267.

{¶10} In his testimony contrasting live birth verses fetal death, Dr. Lee discussed the conditions that would be present on a child who had died in utero. He discussed how the child would have decomposition, peeling of the skin, and the skin of the child would become really dark purple to almost black in coloring. Id. at 265-266. Dr. Lee testified that Cayden did not have any of the conditions to indicate that he had died in utero. Id. at 265. He also testified that Cayden's internal organs did not appear in the condition that would have occurred if he had died in utero. Id. at 266. Dr. Lee testified that he had not known of Gillum's text message that Cayden had moved and, when presented with Gillum's text message, he stated it would lean him, "towards it being a live birth versus not being a live birth." Id. at 276. Dr. Lee further testified that a child could receive oxygen through the umbilical cord and survive for "a couple of minutes" outside of the mother. 2T. at 276-277. Dr. Lee testified that a baby could take a couple of mouth gasps and not fill any air in the lungs. Id. at 313-314. That is the reason that nurses and doctors try to stimulate the baby to get the baby to cry, and get big cries and gasps, to get air down into the lungs and airways. Id.

{¶11} Dr. John Wells Logan III, an academic neonatologist with Nationwide Children's Hospital and The Ohio State University also testified for the state. Dr. Logan testified concerning what is seen when there is a fetal death versus a live birth. 2T. at 406. Dr. Logan testified that a baby born without a heartbeat is stillborn and would typically be a blue-gray ashen color. Id. at 406. Further, even live-born babies are often

born purple and take time to "pink up."  Id. at 417.  Dr. Logan said he reviewed the coroner's report and State's Exhibit 6, the photograph taken by Gillum of Cayden.  Id. at 412-415.  He opined that based on the "pink to purple color of the skin" and the positioning of the baby's legs in the image, the baby had cardiac output and was born alive.  Id. at 415-416.  He also opined that this baby could have been resuscitated and survived.  Id. at 426.

### Crim.R. 29 Motion for Acquittal

{¶12} At the conclusion of the state's case, the defense moved for a Crim. R. 29 judgment of acquittal on all counts.  The trial court granted the motion as to involuntary manslaughter because the evidence failed to prove that, even if the baby was born alive, he could have survived had Gillum called 9-1-1.  4T. at 682-685.  The trial court denied the motion as to the other charges, explaining, "although it is close, there is sufficient evidence that the baby was born alive, if believed - there's contrary evidence, don't get me wrong - but there is sufficient evidence [.].."  Id. at 682-683.

### The Defense Case

{¶13} The defense called forensic pathology expert Dr. Kimberly Collins.  Dr. Collins testified Gillum had a stillborn baby and no medical care would have changed that outcome.  Id. at 704; 715; 722; 749; 762.  Dr. Collins relied on several sources to reach that conclusion.  Dr. Collins relied on the corner report, autopsy report, toxicology report, metabolic screen report, the medical records from LMH, 33 autopsy photographs, 196 coroner and scene photographs, the photo of Cayden, and the autopsy slides.  4T. at 704.

**{¶14}** First, she relied on the coroner's float test results, which provided no signs of lung expansion or inhalation. Id. at 714. Second, the coroner's x-rays revealed no air had entered the lungs. Id. at 715. Third, lung tissue slides taken by the coroner showed no air had traveled into those organs. Id. at 714- 715. Fourth, she relied on the coroner's decision to issue a fetal death certificate. Id. at 709-710. Dr. Collins testified that a live-born baby would have exhibited signs of respiration, heartbeat, and voluntary movements, and that none of the autopsy tests demonstrated any signs of life. With respect to Gillum's "it's moving" text, Dr. Collins testified that there is a significant difference between voluntary and involuntary movement and even something that is dead can move involuntarily. Id. at 719-721. She gave no weight to the text because it was impossible to know if the baby moved voluntarily or involuntarily. Id. at 737; 744-745. In response to a question from the jury, Dr. Collins testified that a baby born alive could have voluntary movement before drawing its first breath. 4T. at 761. Further, a child can live outside the womb for a couple of minutes before it needs air. Id. at 761-762. Dr. Collins agreed that a live birth could involve one of three things, a heartbeat, voluntary muscle movement, or breathing. Id. at 766. It is not necessary to have all three in order to classify a birth as a live birth. Id. Dr. Collins further agreed that it is useful to assess a child's color in a live birth. Id. at 766. Dr. Collins testified that you could not determine evidence that a heart was beating from an autopsy. Id. at 767

**{¶15}** Dr. Lisa Ferriera testified as an obstetrics and gynecology expert and asserted that it is impossible to render an opinion about heartbeat or cardiac output from a photograph. 5T. at 841-846. Dr. Ferriera testified that because the coroner's report did

not show signs of exsanguination, she did not believe there was cardiac output from Cayden. Id. at 877.

## The Verdict

**{¶16}** At the conclusion of the trial, the trial court defined the terms "Live Birth," "Fetal Death," and "Stillborn" to the jury. 5T. at 977- 978. With respect to the charge of Endangering Children, the trial court instructed the jury that they had to make a "Special Finding" that "Cayden Gillum was born alive" in order to convict Gillum. Id. at 979.

**{¶17}** The jury found Gillum guilty of Endangering Children, Tampering with Evidence, and Abuse of a Human Corpse. The jury further made the special finding that Cayden was born alive.

### Assignments of Error

**{¶18}** Gillum raises five Assignments of Error,

**{¶19}** "I. THE TRIAL COURT ERRED BY DENYING KALINA GILLUM'S PRETRIAL MOTION TO DISMISS THE INDICTMENT.

**{¶20}** "II. THE TRIAL COURT ERRED BY ALLOWING A NEONATOLOGIST TO TESTIFY THAT HE COULD DETERMINE LIVE BIRTH FROM THE COLOR IN A CELL PHONE PHOTOGRAPH. FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; ART. I, SECS. 10 AND 16, OF THE OHIO CONSTITUTION; EVID.R. 702.

**{¶21}** "III. THE TRIAL COURT ABUSED ITS DISCRETION, TO KALINA'S MATERIAL PREJUDICE, WHEN IT EXCLUDED THE TESTIMONY OF AN EXPERT WITNESS ON INTIMATE PARTNER VIOLENCE. SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION.

**{¶22}** "IV. KALINA'S CONVICTIONS FOR CHILD ENDANGERING AND ABUSE OF A CORPSE WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE, VIOLATING HER RIGHT TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ART. I, SEC. 10, OF THE OHIO CONSTITUTION.

**{¶23}** "V. KALINA GILLUM'S CONVICTIONS FOR ENDANGERING A CHILD AND ABUSE OF A CORPSE WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF HER RIGHT TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION."

I.

**{¶24}** In her First Assignment of Error, Gillum argues the trial court erred in denying her pre-trial motion to dismiss the indictment. Specifically, the defense moved to dismiss, arguing criminal charges may not be based on a pregnant woman's acts in relation to her own pregnancy. The trial court denied the motion, concluding two factual disputes remained, (1) whether a live birth occurred and, if so, (2) whether the live-born baby died as a proximate result of child endangering. *Motion hearing*, May 10, 2021 at 7-8; *Judgment Entry,* filed May 10, 2021 [Docket Entry No. 151].

Standard of Appellate Review

**{¶25}** Appellate courts generally apply de novo review when reviewing trial court decisions to dismiss indictments. *State v. Cole,* 5th Dist. Guernsey No. 20CA000019, 2021-Ohio-1027, ¶9, *citing State v. Miller*, 2nd Dist. Montgomery No. 28284, 2019-Ohio-3294, ¶ 13.

**{¶26}** In *State v. Troisi,* the Court observed,

"When a defendant moves to dismiss an indictment, the threshold question is whether the trial court can determine the motion without reference to the general issue to be tried." *State v. Hitsman*, 9th Dist. Medina No. 18CA0015-M, 2018-Ohio-5315, 2018 WL 6843733, ¶ 15, *citing State v. Palmer*, 131 Ohio St.3d 278, 2012-Ohio-580, 964 N.E.2d 406, ¶ 22, and *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶18. "'If the allegations contained in the indictment constitute offenses under Ohio criminal law, it is premature to determine, in advance of trial, whether the state could satisfy its burden of proof with respect to those charges, and thus, a motion to dismiss must be denied.'" *State v. Swanson*, 11th Dist. Ashtabula No. 2015-A-0006, 2015-Ohio-4027, 2015 WL 5729710, ¶17, *quoting State v. Kolat*, 11th Dist. Lake No. 2001-L-117, 2002-Ohio-4699, 2002 WL 31008773, ¶ 16, and *State v. Medinger*, 11th Dist. Portage No. 2011-P-0046, 2012-Ohio-982, 2012 WL 764427, ¶11. Thus, "a motion to dismiss based on a defect in the indictment 'must not entail a determination of the sufficiency of the evidence to support the indictment"; the earliest point that such concerns can be raised is at the conclusion of the state's case in chief through a properly supported Crim.R. 29 motion. Id., *citing Kolat* and *State v. Rode*, 11th Dist. Portage No. 2010-P-0015, 2011-Ohio-2455, 2011 WL 2083983, ¶14.

8th Dist. Cuyahoga Nos. 109871, 109874, 109875, & 109876, 2021-Ohio-2678, 176 N.E.3d 1160, ¶9.

Issue for Appellate Review:  *Whether the trial court erred in overruling Gillum's motion to dismiss the indictment*

**{¶27}** The trial judge entered a judgment of acquittal on the involuntary manslaughter charge.  Therefore, we will address Gillum's argument with respect to the charges of Child Endangering, Abuse of a Human Corpse and Tampering with Evidence.

**{¶28}** "The purposes of an indictment are to give an accused adequate notice of the charge, and enable an accused to protect himself or herself from any future prosecutions for the same incident."  *State v. Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162, ¶ 7.  "'An indictment meets constitutional requirements if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."'"  Id. at ¶ 9, *quoting State v. Childs*, 88 Ohio St.3d 558, 564–565, 728 N.E.2d 379(2000), *quoting, Hamling v. United States*, 418 U.S. 87, 117–118, 94 S.Ct. 2887, 41 L.Ed.2d 590(1974).

**{¶29}** The indictment in this case set forth the elements of endangering children under R.C. 2919.22(A) and specified that Gillum was being charged with a third-degree felony.  The only circumstance in which endangering children in violation of R.C. 2919.22(A) is a third-degree felony is when the victim suffers serious physical harm.  R.C. 2919.22(E)(2)(c).  The statute further requires that the parent violate a duty of care, protection, or support.

**{¶30}** The indictment in the case at bar tracks the statutory language of R.C. 2919.22, informs Gillum of the charge against which she must defend, and enables her to plead an acquittal or conviction in bar of future prosecutions for the same offense.

{¶31} Without a doubt, an indictment is defective if it alleges violations of R.C. Chapter 2919 by a person who is not subject to that chapter. *See, State v. Palmer,* 131 Ohio St.3d 278, 2012-Ohio-580, 964 N.E.2d 406, ¶23. Gillum's motion, however, required consideration of the general issues at trial—whether the child was born alive, and whether Gillum violated a duty of care, protection, or support that created a substantial risk to the health or safety of the child. The Bill of Particulars filed February 2, 2021 specifically referenced Gillum's conduct, among other things, during and after the delivery of Cayden as constituting the crime. [Docket No. 110].

{¶32} The indictment in this case set forth the elements of tampering with evidence in violation of R.C. 2921.12(A)(1)[2]. Gillum's motion to dismiss this charge requires the trial court conclude that there was not a live birth but a prenatal loss, which is an issue for the jury to decide based upon the evidence presented at trial. The indictment in the case at bar tracks the statutory language of R.C. 2921.12(A)(1), informs Gillum of the charge against which she must defend, and enables her to plead an acquittal or conviction in bar of future prosecutions for the same offense. The Bill of Particulars filed February 2, 2021 informed Gillum that her conduct in arriving at the hospital with an umbilical cord hanging out but no baby made it likely that the police would begin an investigation. The state alleged that the baby had been born alive. Gillum deleted text messages from her phone.

{¶33} The indictment in the case at bar set forth the elements of abuse of a human corpse in violation of R.C. 2927.01(B). Gillum's motion to dismiss this charge requires the trial court conclude that there was not a live birth but a prenatal loss, which is an issue for the jury to decide based upon the evidence presented at trial. The indictment in the

---

[2] Gillum does not contend that the evidence was insufficient to convict her of Tampering with Evidence, *See,* Assignment of Error IV*, infra.*

case at bar tracks the statutory language of R.C. 2927.01(B), informs Gillum of the charge against which she must defend, and enables her to plead an acquittal or conviction in bar of future prosecutions for the same offense. The Bill of Particulars filed February 2, 2021 alleged that Gillum and Mull acted together in disposing of Cayden's body wrapped in a towel, inside a shoebox stuffed inside a trash bag. The state alleged that the baby had been born alive.

**{¶34}** The indictment in the case at bar was not defective. The trial court correctly overruled Gillum's motion to dismiss the indictment.

**{¶35}** Gillum's First Assignment of Error is overruled.

II.

**{¶36}** In her Second Assignment of Error, Gillum asserts the trial court erred by allowing Dr. Logan to testify that, in his expert opinion and based on the photo of Cayden shortly after his birth, Cayden was born alive.

Standard of Appellate Review

**{¶37}** In *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, the Supreme Court observed,

> Neither special education nor certification is necessary to confer expert status upon a witness. "The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Hartman,* 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v. Baston,* 85 Ohio St.3d 418, 423, 709 N.E.2d 128. Pursuant to Evid.R. 104(A), the trial court determines whether a witness qualifies as an expert,

and that determination will be overturned only for an abuse of discretion.

*State v. Hartman,* 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v. Williams*

(1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 446 N.E.2d 444.

*Thomas* at ¶46.

**{¶38}** An abuse of discretion can be found where the reasons given by the court

for its action are clearly untenable, legally incorrect, or amount to a denial of justice, or

where the judgment reaches an end or purpose not justified by reason and the evidence.

*Tennant v. Gallick,* 9th Dist. Summit No. 26827, 2014-Ohio-477, ¶35; In *re Guardianship*

*of S .H.*, 9th Dist. Medina No. 13CA0066–M, 2013–Ohio–4380, ¶ 9; *State v. Firouzmandi,*

5th Dist. Licking No. 2006–CA–41, 2006–Ohio–5823, ¶54.

Issue for Appellate Review: *Whether the trial judge's decision permitting Dr. Logan*

*to offer an expert opinion based on a cell phone photograph taken at or near Cayden's*

*birth that this baby's color indicated cardiac output is clearly untenable, legally incorrect*

*or amounts to a denial of justice, or whether the judgment reaches an end or purpose not*

*justified by reason and the evidence.*

**{¶39}** Gillum does not contest Dr. Logan's expert qualifications; rather, her

objection is centered upon his methodology.

**{¶40}** Prior to trial, the defense filed a motion to exclude Dr. Logan's testimony

because his methodology for determining cardiac output in a baby based upon a cell

phone photograph was invalid.  Gillum contends that his methodology failed under

*Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d

429 (1993) because he had never written about his methodology, it had not been peer-

reviewed, and he could not describe its accuracy. The trial judge conducted a so-called *Daubert* hearing. *See,* T. *Oral Hearing*, May 11, 2021.

**{¶41}** Dr. Logan testified that he is an academic neonatologist at Nationwide Children's Hospital and at The Ohio State University. T. *Oral Hearing*, May 11, 2021 at 9. In his over 17 years of experience, Dr. Logan has taken care of infants born between the gestational age of 27 to 28 to 30 weeks hundreds of times. Id. at 10. Dr. Logan is a member of the Extremely Low Gestational Age Newborn Network. Id. at 15. Over one-half of Dr. Logan's 25 publications are with that organization. Id.

**{¶42}** Dr. Logan testified at the *Daubert* hearing that infants born pre-term would not breathe spontaneously; rather, they would often need either stimulation or positive pressure ventilation to breathe. Id. at 11. Dr. Logan described the stimulation as stimulating the hands or feet or rubbing the back. Id.

**{¶43}** Dr. Logan testified that the three primary components of the Apgar score used to assess neonates at birth are heart rate, respirations, and color. T. *Oral Hearing*, May 11, 2021 at 12. Dr. Logan testified that a neonates color would tell whether the baby has adequate cardiac output, and if the baby has signs of life. Id. at 13. Dr. Logan described cardiac output as the heart's ability to push blood to the tissues in the body. Id.

**{¶44}** Dr. Logan testified during the *Daubert* hearing that he reviewed a photograph of Cayden that the state had provided to him. Id. at 17; 30. Dr. Logan testified that based upon his education, experience and knowledge he was able to form an opinion based upon the photograph that the baby had cardiac output. Id. at 17-18; 31-33.

**{¶45}** The trial court allowed Dr. Logan's testimony about the photograph, reasoning that objections to his methodology went to the weight of his conclusions,

[A]nd not whether or not he's qualified to evaluate a photograph and render an opinion based on recent cardiac activity based on color. According to his testimony, that's a fairly reliable indicator. Maybe not from a photograph obviously, because most of these situations occur in a hospital setting. But, the objections go to the weight, not to his - - not to admissibility of his testimony.

T. *Oral Hearing*, May 11, 2021 at 40.

**{¶46}** Evid.R. 702 provides:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

**{¶47}** Evid.R. 702(C) requires that an expert's testimony be based on "reliable scientific, technical, or other specialized information." In *State v. D'Ambrosio*, 67 Ohio St.3d 185, 616 N.E.2d 909 (1993) the Supreme Court held that expert witnesses in criminal cases can testify in terms of possibility rather than in terms of a reasonable scientific certainty or probability. In *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, the Supreme Court further noted,

The treatment of such testimony involves "an issue of sufficiency, not admissibility." [*State v. D'Ambrosio*]; see also *State v. Jones* (2000), 90 Ohio St.3d 403, 416, 739 N.E.2d 300. "'Questions about the certainty of the scientific results are matters of weight for the jury.'" *State v. Allen,* 5th Dist. No. 2009-CA-13, 2010-Ohio-4644, 2010 WL 3784818, ¶ 157, *quoting United States v. Brady* (C.A.6, 1979), 595 F.2d 359, 363.

Id. at ¶ 77. The Court further made clear that,

Ohio has a split application of Evid.R. 702. Criminal cases adhere to the *D'Ambrosio* standard in allowing expert opinion in terms of possibilities to be admitted under Evid.R. 702. In contrast, Ohio courts require expert opinions in civil cases to rise to the level of probabilities before being admitted under Evid.R. 702.

*Lang,* at ¶ 81.

{¶48} The defense called forensic pathology expert Dr. Kimberly Collins who testified that in arriving at her conclusions, she relied upon, among other items, 33 autopsy photographs, 196 coroner and scene photographs, the photo of Cayden, and the autopsy slides. 4T. at 704. Dr. Lisa Ferriera, also called by the defense, testified that in reaching her opinions, she relied upon medical records, interviews with the police officers, some text messages, and a photograph viewed on her computer. 5T. at 841.

{¶49} None of the expert witnesses was present during the delivery of Cayden or at any time thereafter. None of the expert witnesses observed Cayden's body in person. Each expert witness relied upon reports, photographs, medical records, x-rays, and autopsy slides that the expert himself or herself did not generate or in person observe being generated. It is obvious that expert witnesses could not testify if they did not rely upon historical records.

{¶50} Dr. Logan was not testifying about the results of a scientific test. Therefore, there was no procedure, test, or experiment involved. Dr. Logan testified that this is the first time he opined about determining cardiac output from a photograph. However, his past experience evidenced the fact that he has been involved in the births of infants born between the gestational age of 27 to 28 to 30 weeks "several hundred times," and he has resuscitated babies with the same color depicted in Cayden's photograph "hundreds of times." T. *Oral Hearing*, May 11, 2021 at 10; 19; 33. According to his testimony, color is a reliable indicator, which he has observed hundreds of times in a hospital setting. Dr. Collins, who the defense called as an expert witness during Gillum's jury trial, agreed that it is useful to assess a child's color in a live birth. 4T. at 766.

{¶51} Clearly, Dr. Logan was qualified as an expert neonatologist. We agree with the trial judge. The fact Dr. Logan based his opinion on his review of a photograph taken by a cell phone, rather than seeing the child in person at the hospital, goes to the weight, not the admissibility of Dr. Logan's testimony.

{¶52} The jury was given the photograph of Cayden. The defense was able to attack the opinion of Dr. Logan on cross-examination and through the presentation of two expert witnesses retained by the defense.

{¶53} Having painstakingly reviewed the record, we conclude that the trial judge's decision to permit Dr. Logan's expert testimony, based on the photograph of Cayden shortly after his birth, that Cayden was born alive was not untenable, legally incorrect and did not amount to a denial of justice, or reach an end or purpose not justified by reason and the evidence.

{¶54} The trial judge correctly denied Gillum's motion to exclude the testimony of Dr. Logan.

{¶55} Gillum's Second Assignment of Error is overruled.

III.

{¶56} In her Third Assignment of Error, Gillum argues that the trial court erred by denying her request to present an expert on intimate partner violence.

Standard of Appellate Review

{¶57} "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). An abuse of discretion can be found where the reasons given by the court

for its action are clearly untenable, legally incorrect, or amount to a denial of justice, or where the judgment reaches an end or purpose not justified by reason and the evidence. *Tennant v. Gallick,* 9th Dist. Summit No. 26827, 2014-Ohio-477, ¶35; *In re Guardianship of S .H.,* 9th Dist. Medina No. 13CA0066–M, 2013–Ohio–4380, ¶ 9; *State v. Firouzmandi,* 5th Dist. Licking No. 2006–CA–41, 2006–Ohio–5823, ¶54.

Issue for Appellate Review: *Whether the trial judge's decision denying Gillum's request to present an expert on intimate partner violence is clearly untenable, legally incorrect or amounts to a denial of justice, or whether the judgment reaches an end or purpose not justified by reason and the evidence.*

**{¶58}** Gillum specifically appeals the trial court's denial of her request to call Dr. Fischer as an expert on intimate partner violence. This matter was initially addressed by the trial court at an oral hearing held on May 10, 2021. After hearing arguments on the matter, the trial court stated it was going to reserve a ruling until the state had concluded its case. T. *Oral Hearing*, May 10, 2021 at 11-12. At the conclusion of the state's case, the issue was brought to the court's attention. 4T. at 690. After hearing arguments from the state and Gillum, the trial court stated,

All right. Well, at this point I'm gonna grant the State's motion to keep

it out...It's an in limine ruling, so if things change I'll re-evaluate.

4T. at 694-695.

**{¶59}** The granting or denial of a motion in limine is a tentative, interlocutory, precautionary ruling reflecting the trial court's anticipatory treatment of an evidentiary issue. *State v. Grubb*, 28 Ohio St.3d 199, 201, 503 N.E.2d 142(1986). In *Grubb*, the Ohio Supreme Court further stated,

The effect of the granting of a motion in limine in favor of the state in a criminal proceeding is to temporarily prohibit the defendant from making reference to evidence which is the subject of the motion. At trial it is incumbent upon a defendant, who has been temporarily restricted from introducing evidence by virtue of a motion in limine, to seek the introduction of the evidence by proffer or otherwise in order to enable the court to make a final determination as to its admissibility and to preserve any objection on the record for purposes of appeal. Cf. *State v. Gilmore, supra*. In the case at bar, appellant failed to make any such proffer and therefore we conclude, consistent with Evid.R. 103, that he waived his right to object to the evidentiary issue on appeal.

28 Ohio St.3d at 203, 503 N.E.2d 142.

**{¶60}** In the case at bar, the defense did not, prior to resting its case, attempt to call Dr. Fischer, request the trial judge revisit the issue of the admissibility of Dr. Fischer's testimony, or make a proffer on the record out of the jury's presence of Dr. Fischer's testimony. Accordingly, Gillum has waived her right to object to the evidentiary issue on appeal. As the trial judge never made a final determination that Dr. Fischer's testimony was inadmissible, the trial judge could not have abused his discretion.

**{¶61}** Gillum's Third Assignment of Error is overruled.

IV. & V.

**{¶62}** In her Fourth Assignment of Error, Gillum argues that there is insufficient evidence to support her conviction for endangering children and abuse of a human

corpse[3].  Further, in her Fifth Assignment of Error, Gillum contends that these convictions are against the manifest weight of the evidence.

Standard of Appellate Review– Sufficiency of the Evidence

**{¶63}** The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...."  This right, in conjunction with the Due Process Clause, requires that each of the material elements of a crime be proved to a jury beyond a reasonable doubt.  *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 2156, 186 L.Ed.2d 314 (2013); *Hurst v. Florida*, 577 U.S. 92, 136 S.Ct. 616, 621, 193 L.Ed.2d 504 (2016).  The test for the sufficiency of the evidence involves a question of law for resolution by the appellate court.  *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶30.  "This naturally entails a review of the elements of the charged offense and a review of the state's evidence."  *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶13.

**{¶64}** When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed.  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997)*; *Walker*, 150 Ohio St.3d at ¶30.  "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *Jenks* at paragraph two of the syllabus.  *State v. Poutney*, 153 Ohio St.3d 474, 2018-Ohio-22, 97 N.E.3d 478, ¶19.  Thus, "on review for evidentiary sufficiency we do

---

[3] Gillum does not challenge her conviction for Tampering with Evidence.

not second-guess the jury's credibility determinations; rather, we ask whether, '*if believed*, [the evidence] would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001), *quoting Jenks* at paragraph two of the syllabus; *Walker* 150 Ohio St.3d at ¶31. We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.'" *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 94, *quoting State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997); *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶74.

Issue for Appellate Review: *Whether, after viewing the evidence in the light most favorable to the prosecution, the evidence, if believed, would convince the average mind that Gillum was guilty beyond a reasonable doubt of Endangering Children and Abuse of a Human Corpse.*

Endangering Children

**{¶65}** Endangering Children, R.C. 2919.22, provides,

(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical

or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.

* * *

(E)(1) Whoever violates this section is guilty of endangering children.

(2) If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following, and, in the circumstances described in division (E)(2)(e) of this section, that division applies:

* * *

(c) If the violation is a violation of division (A) of this section and results in serious physical harm to the child involved, a felony of the third degree

{¶66} R.C. 2901.01(A)(5) provides,

(5) "Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

**{¶67}** "Substantial risk" means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur, or that certain circumstances may exist. R.C. 2901.01(A)(8).

**{¶68}** Dr. Logan testified that a baby born without a heartbeat is stillborn and would typically be a blue-gray ashen color[4]. Id. at 406. Further, even live-born babies are often born purple and take time to "pink up." Id. at 417. Dr. Logan said he reviewed the coroner's report and State's Exhibit 6, the photograph taken by Gillum of Cayden. Id. at 412-415. He opined that based on the "pink to purple color of the skin" and the positioning of the baby's legs in the image, the baby had cardiac output and was born alive. Id. at 415-416. He also opined that this baby could have been resuscitated and survived. Id. at 426.

**{¶69}** Dr. Lee testified that Cayden did not have any of the conditions to indicate that he had died in utero. Id. at 265. He also testified that Cayden's internal organs did not appear in the condition that would have occurred if he had died in utero. Id. at 266. Dr. Lee testified that he had not known of Gillum's text that Cayden had moved and, when presented with Gillum's text message, he stated it would lean him "towards it being a live birth versus not being a live birth." Id. at 276. Dr. Lee further testified that a child could receive oxygen through the umbilical cord and survive "a couple of minutes" outside of the mother. 2T. at 276-277. Dr. Lee testified that a baby could take a couple of mouth

---

[4] We addressed the admissibility of Dr. Logan's testimony in our disposition of Gillum's Second Assignment of Error.

gasps and not fill any air in the lungs. Id. at 313-314. That is the reason that nurses and doctors try to stimulate the baby to get the baby to cry, and get big cries and gasps, to get air down into the lungs and airways. Id.

{¶70} Dr. Collins testified that a baby born alive could have voluntary movement before drawing its first breath. 4T. at 761. Further, a child can live outside the womb for a couple of minutes before it needs air. Id. at 761-762. Dr. Collins agreed that a live birth could involve one of three things- a heartbeat, voluntary muscle movement, or breathing. Id. at 766. It is not necessary to have all three in order to classify a birth as a live birth. Id. Dr. Collins further agreed that it is useful to assess a child's color in a live birth. Id. at 766. Dr. Collins testified that you could not determine evidence that a heart was beating from an autopsy. Id. at 767.

{¶71} Gillum initially stated that, around 6:00 p.m. the day before, she had cramping, heavy bleeding, and pain, but that she had not seen a baby. Id. at 48. A deleted text from Gillum's phone read, "Braden, it's moving." Id. at 552-553. At no time did Gillum attempt to summon medical attention for the child.

{¶72} Paramedic Steven Gregory testified that he was asleep at 2:00 a.m. when the station received an emergency call from law enforcement. Id. at 139-140. He explained that it takes him about thirty seconds to get out of bed, get dressed, and be ready to leave the station. Id. at 140. That morning, it took him just over five minutes from dispatch to arrive at the apartment. Id. at 142. When he arrived, he checked the baby and found neither a heartbeat nor chest movement. Id. at 144[5].

---

[5] Gillum contends that the trial judge found this testimony not to be credible because at the time of night Gregory responded, traffic is substantially less than during normal daytime hours. However, the testimony was not stricken nor was the jury advised to disregard the testimony. Therefore, the jury was free to determine the credibility of Paramedic Gregory's testimony among themselves.

**{¶73}** Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Gillum violated a duty of care, creating a substantial risk to the health or safety of her child that resulted in serious physical harm to the child.

**{¶74}** We hold, therefore, that the state met its burden of production regarding the elements of endangering children; accordingly, there was sufficient evidence to support Gillum's conviction for endangering children.

Offenses against human corpse

**{¶75}** R.C. 2927.01 Offenses Against human corpse provides,

(A) No person, except as authorized by law, shall treat a human corpse in a way that the person knows would outrage reasonable family sensibilities.

(B) No person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities.

(C) Whoever violates division (A) of this section is guilty of abuse of a corpse, a misdemeanor of the second degree. Whoever violates division (B) of this section is guilty of gross abuse of a corpse, a felony of the fifth degree.

**{¶76}** Gillum was charged with complicity with Mull to a violation of R.C. 2927.01(B).

**{¶77}** R.C. 2923.03(A)(2) sets forth the elements for complicity and provides, in relevant part:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

*** 

(2) Aid or abet another in committing the offense;

* * *

(B) It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender.

(C) No person shall be convicted of complicity under this section unless an offense is actually committed, but a person may be convicted of complicity in an attempt to commit an offense in violation of section 2923.02 of the Revised Code.

* * *

**{¶78}** It is true that a person's mere association with a principle offender is not enough to sustain a conviction based on aiding and abetting. *State v. Sims*, 10 Ohio App.3d 56, 58, 460 N.E.2d 672, 674-675 (8th Dist. 1983). In order to constitute aiding and abetting, the accused must have taken some role in causing the commission of the offense. Id. With respect to the requirements for a conviction for complicity by aiding and abetting, the Supreme Court of Ohio has stated,

> To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the

criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*State v. Johnson*, 93 Ohio St.3d 240, 2001–Ohio–187, 749 N.E.2d 749, at syllabus.

{¶79} Aiding and abetting may be shown by both direct and circumstantial evidence and participation may be inferred from presence, companionship, and conduct before and after the offense is committed. *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68, (8th Dist. 1981), *citing State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist. 1971); *See also, State v. Mendoza*, 137 Ohio App.3d 336, 342, 738 N.E.2d 822(3rd Dist. 2000), *quoting State v. Stepp*, 117 Ohio App.3d 561, 568–569, 690 N.E.2d 1342(4th Dist. 1997).

{¶80} Aiding and abetting may also be established by overt acts of assistance such as driving a getaway car or serving as a lookout. *State v. Cartellone*, 3 Ohio App.3d at 150, 444 N.E.2d 68. *See also, State v. Trocodaro*, 36 Ohio App.2d 1, 301 N.E.2d 898 (10th Dist. 1973); *State v. Lett*, 160 Ohio App.3d 46, 52, 2005–Ohio–1308, 825 N.E.2d 1158, 1163 (8th Dist.); *State v. Polite,* 5th Dist. Stark No. 2017 CA 00129, 2018-Ohio-1372, ¶56.

{¶81} Gillum arrived at the hospital with an exposed umbilical cord but no baby. When asked at the hospital, Gillum told the nurse she did not remember seeing a baby. 1T. at 48. The nurse was unable to discern the whereabouts of the baby. Id.

{¶82} Mull texted Gillum that the police had started an investigation. Gillum told Detective Fisher that Mull told her he had put the baby in a box because he knew they would have to go to the hospital. 3T. at 591. The baby's body was found wrapped in a bloody towel inside a shoebox that had been placed inside a garbage bag by the

bathroom area. 1T. at 123. Gillum deleted text messages between her and Mull from her cell phone. Mull texted Gillum that he told the police that Gillum had put the baby's body in the box, "but when Heath decides to show up, I'm telling them I did it...." 3T. at 544-545.

{¶83} Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Gillum aided and abetted Mull in disposing of the baby's body.

{¶84} We hold, therefore, that the state met its burden of production regarding the elements of aiding and abetting in the abuse of a human corpse; accordingly, there was sufficient evidence to support Gillum's conviction for aiding and abetting in the abuse of a human corpse.

Standard of Appellate Review – Manifest Weight.

{¶85} As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355*; *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001).

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.

* * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

**{¶86}** The reviewing court must bear in mind; however, that credibility generally is an issue for the trier of fact to resolve. *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy*, 4th Dist. Ross No. 07CA2953, 2008–Ohio–1744, ¶ 31. Because the trier of fact sees and hears the witnesses and is particularly competent to decide whether, and to what extent, to credit the testimony of particular witnesses, the appellate court must afford substantial deference to its determinations of credibility. *Barberton v. Jenney,* 126 Ohio St.3d 5, 2010–Ohio–2420, 929 N.E.2d 1047, ¶ 20. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002–Ohio–1152, at ¶ 13, *citing State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999). Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer*, 4th Dist. Pickaway No. 11CA9, 2012–Ohio–1282, ¶ 24.

**{¶87}** Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that " 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be

reversed and a new trial ordered.'" *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." Id.

Issue for Appellate Review: *Whether the jury clearly lost their way and created such a manifest miscarriage of justice, that the convictions must be reversed and a new trial ordered.*

**{¶88}** The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP–604, 2003–Ohio–958, ¶ 21, *citing State v. Antill,* 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP–1238, 2003–Ohio–2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), paragraph one of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997).

**{¶89}** In the case at bar, the jury heard the witnesses subjected to cross-examination, heard Gillum's recorded statement to the police, and viewed the evidence. The jury heard Gillum's attorneys' arguments and explanations about the evidence and her actions. Further, the jury was instructed concerning the definitions of the terms, "Live Birth," "Fetal Death," and "Stillborn." 5T. at 977- 978. The jury further made the special finding that Cayden was born alive.

**{¶90}** We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717(1st Dist. 1983). Based upon the foregoing and the entire record in this matter we find Gillum's convictions are not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of Gillum's guilt. The jury neither lost their way nor created a miscarriage of justice in convicting Gillum of the offenses.

**{¶91}** Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crimes for which Gillum was convicted.

**{¶92}** Gillum's Fourth and Fifth Assignments of Error are overruled.

{¶93} The judgment of the Licking County Court of Common Pleas is affirmed.


By Gwin, P.J,

Hoffman, J., and

Wise, John, J., concur

[Cite as *State v. Gillum*, 2022-Ohio-2005.]